UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
BROCKTON POWER LLC, and                                    )
BROCKTON POWER COMPANY LLC,                          )
                                                                              )
                                              Plaintiffs,             )
                                                                              )
                        v.                                                 ) CIVIL ACTION
                                                                              ) NO. _____
CITY OF BROCKTON, MA; PLANNING BOARD OF        )
THE CITY OF BROCKTON; BROCKTON CITY COUNCIL; )
MAYOR LINDA BALZOTTI, CITY COUNCILOR THOMAS )
BROPHY, CITY COUNCILOR MICHELLE DUBOIS, CITY )
COUNCILOR JASS STEWART, FORMER MAYOR JAMES )
HARRINGTON, PLANNING BOARD CHAIRPERSON        )
WAYNE MCALLISTER, and PLANNING BOARD MEMBER )
SUSAN NICASTRO, individually and as current        )
and former officials of the CITY OF BROCKTON,        )
                                                                              )
                                              Defendants.            )
_____)

## __COMPLAINT__

Plaintiffs, as landowners and developers of a proposed electric power generating facility in Brockton, reluctantly bring this civil rights action seeking injunctive and declaratory relief, in addition to compensatory and punitive damages, for multiple, deliberate deprivations of constitutionally protected rights and abuses of power by the City of Brockton and certain of its former and current public officials.

Defendants have, over a period of years, conspired to systematically deprive plaintiffs of the constitutional rights and privileges that all landowners in America enjoy, including the right to develop their land, consistent with proper state and local rules and procedures, and to be free from outrageous and unfair acts of discrimination, arbitrary and capricious action or inaction, and flagrant denial of procedural and substantive due process rights.

This case is important because if cities and towns in Massachusetts are permitted, under color of law, to conduct themselves as lawlessly as Brockton has conducted itself toward a clean

and safe energy project on private industrial property specifically zoned for such use for over forty years, then no such project is safe for development in the Commonwealth, and the state's energy infrastructure is, as a consequence, impermissibly limited and unjustifiably compromised.

For five years, plaintiffs have been trying to build an electric generation facility and an associated electricity interconnection switchyard (the "Project") on industrial land in Brockton that has been expressly zoned to permit such particular use since 1965.  Plaintiffs purchased their interests in the property in reliance on this longstanding municipal zoning designation.

The Project is important for the Commonwealth of Massachusetts because it helps to satisfy the region's diverse and growing energy supply needs by adding an additional source of affordable, efficient, and reliable power to New England's electric power grid, a grid increasingly challenged by the decommissioning of older coal fired plants.  Even with wind and solar power on the ascent, domestically produced natural gas fired energy production remains among the most efficient, least cost, safe and reliable sources of electric power to meet the region's growing energy needs.

To this end, the state level Commonwealth of Massachusetts Energy Facilities Siting Board (the "state Siting Board") has granted its formal approval for the Project to be sited at the proposed location in Brockton, subject to compliance with local Brockton zoning and permitting procedures, properly applied -- meaning lawfully, in good faith, and without illegal acts of discrimination and denial of equal protection of the laws.

State and federal officials charged with regulatory responsibility for such approvals found, after weeks of adjudicatory hearings, expert witness testimony, and appropriate scientific and engineering review, that the proposed Project complies with all state environmental laws and regulations and is safe and clean.  Moreover, the Massachusetts Department of Environmental Protection (the "DEP"), after years of thorough review, recently issued the Project its most essential approval: an Air Permit that authorizes the Project's electrical output and operation at the designated site in Brockton.

Even though the Project has satisfied the stringent state and federal standards, defendants, motivated by their personal and political animus against the Project, have engaged in a shocking, outrageous, and flagrantly discriminatory pattern of abuse and manipulation of their local land use powers in their effort to fatally delay and ultimately kill the Project.

In doing so, defendants, at all times acting under color of state law, have violated 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution, in addition to damaging plaintiffs through abuse of process, tortious interference with plaintiffs' advantageous business relations, defamation, and other illegal actions.

These actions, both coordinated and uncoordinated, under color of the City's municipal regulatory powers, have also deprived the landowners of the economic value of their real estate thus entitling them to fair compensation as well as money damages.

These deliberate actions to deprive plaintiffs of their constitutional rights are so flagrant and offensive as to shock the conscience and compel judicial intervention.

In the absence of federal judicial intervention to enforce the rule of law and protect the plaintiffs' rights, the Project will fail and these defendants will have successfully defeated a worthy project, stranded innocent property owners' assets, and emboldened others to do the same.  Indeed, it cannot be the law of the United States that such flagrant disregard for property owners' fundamental rights to due process and equal protection of the laws is allowed to stand. These defendants must be held legally and financially accountable for their wrongful actions and ordered by the Court to cease and desist from any further or future deprivations of fundamental rights.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 2201, and 42 U.S.C. § 1983.

2.      Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this claim occurred in Massachusetts.

3.      Plaintiff Brockton Power LLC ("Landowner") is a limited liability company duly organized under the laws of the Commonwealth, with its principal place of business at 795 Plymouth Street, Holbrook, Massachusetts.  At all times relevant hereto, Landowner has owned land in Brockton, Massachusetts, on Oak Hill Way, identified according to the Brockton Assessors' Map 119 as Lots 3 and 4, Industrial Boulevard, Brockton (the "Generator Site").  The proposed generating plant as part of the Project is to be built on the Generator Site.  Brothers Dennis and Leo Barry are the majority members of Brockton Power LLC.

4.      Plaintiff Brockton Power Company LLC ("Brockton Power," or the "Project Owner") is a limited liability company duly organized under the laws of the Commonwealth, with its principal place of business at 31 Milk Street, Boston, Massachusetts.  At all times relevant hereto, Brockton Power has had a binding option to purchase the Generator Site. Brockton Power also owns land in Brockton, Massachusetts, identified according to the Brockton Assessors' Map 119 as Lots 89 and 90, at which Brockton Power proposes to build the electricity interconnection switchyard (the "Switchyard Site").    Brockton Power Company LLC is the Barry brothers' chosen entity to design, build, and manage the Project as a permitted use of the industrial Generator Site in Brockton.

5.      Defendant City of Brockton (the "City") is a body corporate and politic established under the laws of the Commonwealth of Massachusetts.  The municipality includes a number of boards, commissions, departments, and agencies with regulatory and policy-making powers in Brockton.

6.      Defendant Planning Board of the City of Brockton (the "Planning Board") is a duly constituted board of the City of Brockton, with its principal office at Brockton City Hall, 45 School Street, Brockton, Massachusetts.

7.      Defendant Brockton City Council (the "City Council") is a duly constituted council of the City of Brockton, with its principal office at Brockton City Hall, 45 School Street, Brockton, Massachusetts.

8.      Defendant Linda M. Balzotti is the Mayor of Brockton, Massachusetts and resides at 4 Orange St., Brockton, Massachusetts.  Mayor Balzotti was a member of the City Council before she was elected mayor in November 2009.  Her actions as alleged in this complaint were taken under the color of law.  She is sued in both her individual as well as official capacities.

9.      Defendant Thomas Brophy is a member of the City Council, and resides at 21 Bates St., Brockton, Massachusetts.  His actions as alleged in this complaint were taken under the color of law.  He is sued in both his individual as well as official capacities.

10.      Defendant Michelle DuBois is a member of the City Council, and resides at 6 Banks St., Brockton, Massachusetts.  Her actions as alleged in this complaint were taken under the color of law.  She is sued in both her individual as well as official capacities.

11.      Defendant Jass Stewart is a member of the City Council, and resides at 14 Clyde St., Brockton, Massachusetts.  His actions as alleged in this complaint were taken under the color of law.  He is sued in both his individual as well as official capacities.

12.      Defendant James Harrington is a former mayor of the City, and resides at 42 Thorny Lea Terrace, Brockton, Massachusetts.  His actions as alleged in this complaint were taken under the color of law.  He is sued in both his individual as well as official capacities.

13.      Defendant Wayne McAllister is the chairperson of the Planning Board, and resides at 30 Kame Street, Brockton, Massachusetts.  His actions as alleged in this complaint were taken under the color of law.  He is sued in both his individual as well as official capacities.

14.      Defendant Susan Nicastro is a member of the Planning Board, and resides at 90 Samuel Avenue, Brockton, Massachusetts.  Her actions as alleged in this complaint were taken under the color of law.  She is sued in both her individual as well as official capacities.

15.      Unless otherwise noted, the term "defendants" includes the named parties and their agents.

## FACTUAL ALLEGATIONS

**I.    The City Supported and Encouraged a Virtually Identical Electric Power Generating Facility on the Exact Same Site Years Before.**

16.    In 1998, Landowner began work to develop an electric generation facility (the "Landowner's proposed project") on the Generator Site.

17.    The Generator Site is located in the I-3 heavy industrial zone in Brockton in which "electric power generating plants" have expressly been "a principal permitted use" for over forty-five years.

18.    Landowner bought the land in good faith reliance on the applicable zoning, building, permitting and other state and local laws and regulations applicable to the use of one's property.

19.    When the Landowner's prior proposed project was first presented, the City (including the then mayor, the City Council and the Conservation Commission) actively supported it, which the City and its consultants declared to be "in the best interest" of the City.

20.    Defendant Balzotti, then a City Councilor, was among the supporters of the Landowner's proposed project.

21.    As of May 2000, the Landowner's proposed project (which was virtually identical to the Project in terms of size, shape, location, water usage and energy source) had received most of the permits and authorizations it needed to construct the facility, including permits and authorizations from the Brockton Zoning Board of Appeals, the Conservation Commission, and the Department of Public Works.

22.    In addition, following an open bid process, the City Council passed an Ordinance on February 14, 2000, authorizing the Landowner's proposed project to purchase two million gallons per day of treated effluent from the City's wastewater treatment facility for a term of forty years.  Landowner agreed to pay the City millions of dollars to purchase this wastewater that was simply being discharged into a nearby river.

23.     Efforts to complete the Landowner's prior proposed project were suspended following the Enron bankruptcy and subsequent economic downturn, which made the Project's economics and financing less feasible.

## II.     Landowner Revives the Prior Project on the Same Site with New Developer, Brockton Power.

24.     In November 2006, Brockton Power was formed to develop, construct, and operate an electric generation facility on the Generator Site.

25.     Landowner chose Brockton Power to be its designated designer and builder of the revived project and thus sold Brockton Power an option to purchase the Generator Site at substantial cost to Brockton Power.  Landowner also assigned to Brockton Power its rights and assets under all contracts and prospective contracts related to Landowner's proposed project.

26.     In addition to acquiring an option to purchase the Generator Site, Brockton Power again, in reliance on the longstanding zoning of the site, acquired a legally binding option to purchase a nearby parcel on Oak Hill Way for the construction of a facility that would connect the Generator Site with the National Grid regional transmission line (the "Switchyard Site").

27.     Brockton Power subsequently exercised its option to purchase the Switchyard Site and now has sole ownership of that property.

28.     Brockton Power acquired its option to purchase the Generator Site and purchased the Switchyard Site at substantial cost and in good faith reliance on the applicable zoning, building, permitting, and other state and local laws and regulations applicable to the use of one's property.

29.     The Project is virtually identical to the prior City-approved project proposed by Landowner in all material respects, in terms of location, property owners, generator size and capacity, water usage, fuel source, and state, federal, and local permit requirements.

30.     Notwithstanding the City's active support for and encouragement of the prior proposed project, certain City officials subsequently reversed their political and policy position

to one of opposing any use of the property for an electric power generating facility, despite the land being zoned for just that purpose.

31.     In support of this new opposition, certain City officials, working in combination with opposition groups, embarked on a campaign of knowingly false disparagement of the Project as dirty, dangerous, and likely to spread Legionnaire's Disease, among other claims that have been rejected as false by the responsible state officials who approved the Project and issued all the necessary state permits and authorizations.

III.     **Defendants Change Their Position and Then Conspire to "Reject, Deny and Starve" the Project.**

32.     In addition to their efforts to disparage the Project, certain City officials, acting both on their own initiative and at the behest of defendants Harrington and Balzotti, undertook a concerted effort to thwart the Project by systematically violating and interfering with plaintiffs' legally protected property rights with improper motive and in bad faith.

33.     One former City official described the conspiracy's goal as a plan to "reject, deny and starve" the Project.

34.     This strategy meant that where City officials thought they could get away with not reviewing the Project's applications at all, they simply ***rejected*** the filings out of hand.

35.     In instances where they felt that review could not be avoided, they conducted pre-textual reviews and then ***denied*** the applications.

36.     And finally, they did whatever they could to ***starve*** the Project by denying it essential water, points of access, and the like without proper justification.

37.     These acts of unlawful obstruction, interference, harassment and conspiracy were deliberately focused on systematically depriving plaintiffs of each of the critical needs of the Project such that it would starve and die.

**STEP 1:  Rezone the Land After the Fact to Block the Plant**

38.     On January 13, 2009, forty-five years after authorizing electric power generating facilities as a permitted use, and many years after plaintiffs purchased their interests in the land in reliance on such zoning, the City Council purported to rezone (*ex post facto*) the City's I-3 zone to <u>remove</u> electric power generating plants as a permitted use.   This effort was accomplished via passage of an ordinance targeted at the Project.

39.     The City Council was fully aware that plaintiffs already had invested substantial resources into the land and were actively pursuing the permits and other regulatory approvals necessary to proceed with the Project.

40.     No other electric power generating plant proposals were on the table in Brockton.

41.     As if rezoning the land wasn't enough, the City Council went even further when it undertook a subsequent *ex post facto* attempt to kill the Project in June 2010 by voting to ban "sound attenuation walls" knowing that such walls were incorporated into the design of the Project that was being reviewed by the state Siting Board.

42.     In seeming recognition of the invalidity of these attempts to rezone the property *ex post facto* or selectively ban certain uses or structures, the City Council has submitted seven separate Home Rule Petitions or Special Acts to the state legislature in order to target the Project, including thinly disguised bans on "stationary sources" of pollution within City limits (even though the City maintains its own stationary source in the form of an incinerator).   The state legislature has rejected each of these petitions from the City Council.

43.     The City Council impermissibly singled out Brockton Power for this knowingly illegal, obstructive and discriminatory treatment.

**STEP 2:  Impose "Martial Law" to Block the Project**

44.     Recognizing that *ex post facto laws* are not legal, fearing that the Project was being successfully permitted at the <u>state</u> level, and knowing that the Project had been specifically designed to comply with local Brockton zoning laws and ordinances (properly applied), the City

Council in February 2010 passed an astonishing and utterly lawless "Resolution" directing that City officials and employees refuse to hear, discuss, review, or process the Project's various permit applications.

45.      Specifically, the Resolution called for an "immediate and complete halt on all deliberations concerning the siting of a power plant in Brockton."

46.      This Resolution was intended to institutionalize within the City an official policy and regulatory regime that would deny plaintiffs their rights to due process and equal protection of the law by refusing to process or even review their land use applications.

47.      Upon information and belief, the City Council has never ordered a "halt on all deliberations" concerning any other development project in the history of Brockton.

48.      The City Council's actions impermissibly singled out plaintiffs for this unconstitutional suspension of rights and constituted unlawful reverse spot zoning, which is *per se* discriminatory.

49.      The City Council's outrageous discriminatory treatment of plaintiffs had no rational basis and was instead due to defendants' specific and bad faith intent to block the Project and injure plaintiffs.

50.      City officials and employees, guided by this officially adopted City policy, subsequently refused to process and approve necessary Project-related filings, applications, and requests.

**STEP 3:  Kick Back and "Reject" Project Filings Out of Hand and Without Due Process**

51.      For example, on June 23, 2010, Landowner submitted a preliminary subdivision plan for the development of the Generator Site to the Planning Board.

52.      The filing of a subdivision plan also has the effect under state law of locking in (i.e., grandfathering) the use of a parcel for the zoned purpose.

-10-

53.     The Planning Board rules set forth the regulatory requirements for a preliminary plan, namely that it must contain "sufficient information about the subdivision to form a clear basis for discussion of its problems and for the preparation of the Definitive Plan."

54.     The preliminary subdivision plan submitted by plaintiffs contained information exceeding the level of detail typically provided for a preliminary plan and far exceeding the level of detail required in order "to form a clear basis for discussion of its problems and for the preparation" of the definitive plan.

55.     The administrative secretary to the City's Planning Department, who acts as the City Planner, physically accepted plaintiffs' submission and, after consulting with the City Engineer, informed Mayor Balzotti that the "plan fully conforms to the rules & regulations."

56.     The City knew that the reason plaintiffs submitted the preliminary subdivision plan was to exercise their lawful right under long-standing state law to freeze or "grandfather" the zoning then in effect for the property, ensuring that plaintiffs would be able to proceed with the Project under the zoning in effect as of the date of the subdivision plan filing.

57.     The City also knew that plaintiffs made their grandfathering submission a few days in advance of the City Council's publicly scheduled vote to amend the City's zoning ordinance designed to block the Project by removing the permitted use and prohibiting "sound attenuation walls."

58.     The acting City Planner, after physically accepting Landowner's subdivision plan and knowing that it froze the zoning then in effect, proceeded to selectively notify only three of the eight Planning Board members -- defendant McAllister, defendant Nicastro, and one other member -- of the filing by plaintiffs.

59.     Rather than inform the full eight-member Planning Board about the submission, let alone allow them to see or review the submission, defendant Nicastro (who, as set forth below, is a leading Project opponent who has spent at least $15,000 of her own money opposing the Project) concocted a pretextual scheme to try to kick back or "reject" the filing as somehow non-conforming.

-11-

60.     Defendant Nicastro fabricated reasons why the submission purportedly did not meet the regulatory requirements (despite the acting City Planner's representation to the Mayor that it did comply with City Ordinances and Planning Board regulations) and personally drafted a one-of-a-kind "rejection" letter for the signature of the Planning Board Chairperson, defendant McAllister.

61.     Defendant Nicastro's purpose in purporting to reject Landowner's submission without review was to attempt to reverse and undo the City's physical acceptance of a timely filed subdivision plan, thereby preventing Landowner from freezing the zoning then in effect.

62.     Defendants Nicastro and McAllister knew that within a few days the City Council would take a final vote on its proposed amendment to the Zoning Ordinance to prevent the Project by removing the permitted use and prohibiting sound attenuation walls.

63.     Realizing that their unilateral decision to "reject" the subdivision plan was legally untenable, defendants Nicastro and McAllister sought to obtain the full Planning Board's after-the-fact ratification at the Planning Board's next scheduled meeting.

64.     In a manipulative attempt to ensure the full Planning Board's support, defendant Nicastro, again acting unilaterally and without legal authority, instructed the acting City Planner not to distribute the Landowner's formal submissions and communications to the other Planning Board members.

65.     Defendant McAllister, the Chairperson, also hoping to raise the ratification issue discretely with the full Board, intentionally directed that the matter be kept off of the publicly posted Planning Board agenda in an effort to control and limit who would attend and speak at the Planning Board meeting on August 5, 2010.

66.     Individual members of the Planning Board, acting without the knowledge -- let alone the authority -- of the full Planning Board, have never undertaken to "reject" a preliminary subdivision plan filed by another commercial landowner.  Nor have they conspired to keep such items and filings off of the Board's publicly posted agenda.

-12-

67.     Defendants Nicastro and McAllister, acting under color of law, and misusing their municipal, regulatory, and administrative power, impermissibly singled out plaintiffs for this discriminatory treatment.

68.     Defendants' unfair and discriminatory treatment of plaintiffs had no rational basis and was instead due to defendants Nicastro and McAllister's malicious and bad faith intent to block the Project and injure plaintiffs.

**STEP 4:  Gag Anyone Who Wants to Speak in Favor of the Project and Make Them Go to Court If They Don't Like It**

69.     Landowner's representative, who had submitted a written request to be heard at the Planning Board's meeting on August 5, 2010, attended the Planning Board's open public meeting even though the matter relating to the subdivision plan had been secretly and selectively omitted from the publicly posted agenda.

70.     When Landowner's representative asked for a chance to be heard at this open public meeting, defendants Nicastro and McAllister, again intent on restricting what information the other members of the Planning Board had about the submission with the hope that their unauthorized actions would be ratified, denied the request to be heard and silenced the landowners' representative, thus denying plaintiffs their due process rights.

71.     Defendants' actions in rejecting the preliminary subdivision plan and refusing to hear from Landowner's representative were utterly unjustified, contrary to law, and undertaken out of malice and bad intent.

72.     Defendants' unlawful conduct forced plaintiffs to commence a Land Court action to protect their rights.

73.     It took over a year and a half of litigation for the City to finally acknowledge and admit that their purported rejection of plaintiffs' filing and subsequent denial of any opportunity to be heard had no lawful basis.

74.     Thus, by Order dated February 9, 2012, the City entered into a stipulated judgment annulling the Planning Board's refusal to accept the filing of the preliminary

subdivision plan (and annulling the Planning Board's subsequent refusal to accept the definitive subdivision plan) and granting Landowner the lawful zoning freeze.

**STEP 5:  If the State Regulators Ask Questions, Assure Them That the City Will Review the Project's Applications Timely and Fairly; Then (at the Mayor's Direction) Simply Refuse, Once Again, to Even Consider the Project's Filings**

75.     In filings with the state Siting Board -- in which the City misleadingly sought to induce the state Siting Board to allow the City to retain a measure of authority over the Project by creating the impression that it would not abuse or misuse that authority -- the City deliberately gave false assurances to state officials in written testimony touting that "the Site Plan Approval process in Brockton takes approximately 60 days from start to finish, and no application for Site Plan Approval has been denied in Brockton."

76.     After giving the state Siting Board this false comfort despite its intention to the contrary, the Planning Board, as predicted, turned around and deliberately refused even to process the Project's site plan.

77.     Indeed, in September 2009, the City's Planning Department and the Planning Board were scheduled to proceed with a statutorily required "technical review" of the Project's site plan for the Generator Site.

78.     The Planning Board informed Brockton Power that the City's Technical Review Committee would review the Project's site plan on October 5, 2009.

79.     Despite the absence of any legal basis not to proceed with the review, defendant Harrington deliberately and outrageously instructed the Chair of the Planning Board and the City's Planning Department not to process the Project's site plan at the technical review meeting.

80.     Upon information and belief, the Mayor's Office has never intervened to block another commercial developer's site plan application or technical review.

81.     Mayor Harrington impermissibly singled out plaintiffs for this discriminatory treatment.

-14-

82.     Mayor Harrington's unfair and discriminatory treatment of plaintiffs had no rational basis and was instead due to his malicious and bad faith intent to block the Project and injure plaintiffs.

83.     This last minute effort by the Mayor's Office to block the path of the Project in 2009 is even more discriminatory and outrageous because the very same technical review committee had twice before reviewed and made minimal comments on the Project's site plan prior to the Mayor's obstructive intervention.

84.     Similarly, during subsequent state Siting Board hearings, Mayor Balzotti emailed the Building Superintendent instructing him to testify at a hearing in opposition to the Project and specifically directing him through his testimony to "help the city . . . prevent the location of this facility in the city" (emphasis added) despite the longstanding City zoning designation to the contrary.

85.     The Mayor's Office and other City officials went even further in discriminating against Plaintiffs by directing the Building Superintendent on how to anticipatorily deny building permit applications that the Project had yet to even submit.

86.     Defendant Balzotti and defendant DuBois, in a further effort to manipulate the state Siting Board and deny plaintiffs due process, also refused to permit the two most knowledgeable City employees to testify at the state Siting Board hearing on the use of City water by the Project because they were deemed to be "pro-Project" and would give truthful testimony that would be contrary to the defendants' official opposition to the Project.

**STEP 6:  Ignore the Advice of City Lawyers to Treat the Project Fairly**

87.     To make matters worse, the City's own legal counsel even warned "that unwarranted delays in the Project's Technical Review process could compromise the City's overall effort [to prevent the Project], by creating the appearance that the City is using delay tactics and acting outside the rules."

88.     Despite these warnings from the City Solicitor's Office, the Planning Board went on to take the unprecedented step of delaying and refusing to even process the Project's site plan.

89.     Defendants Nicastro and McAllister and the Planning Board impermissibly singled out plaintiffs for this discriminatory treatment.

90.     Defendants' unfair and discriminatory treatment of plaintiffs had no rational basis and was instead due to their malicious and bad faith intent to block the Project and injure plaintiffs.

91.     Indeed, the City Solicitor's office has stated to plaintiffs' counsel, in response to complaints about the City's pattern of discrimination and denials of due process, that on multiple occasions, senior City Officials, including certain defendants here, were specifically warned and admonished regarding their legal obligations to treat the plaintiffs' Project fairly.  The City officials ignored this advice.

92.     There can be no more powerful evidence of bad faith intent on the part of the defendants than that they ignored such specific legal advice.

**STEP 7:  If Compelled to Actually Review a Project Application, Deny It No Matter What and "Let Them Litigate"**

93.     In addition to falsely disparaging the Project, silencing Project supporters, suspending due process by City Council Resolution, declaring the Project off limits for any regulatory discussion or review, and then kicking back/rejecting and refusing even to consider Project applications as required by law, the City embarked on a scheme to deny Project applications on demonstrably pretextual grounds or simply no grounds at all.

94.     For example, defendant Nicastro, acting in her official capacity as a member of the Planning Board, instructed the City Clerk not to issue a certificate of constructive approval for a subdivision plan submitted by the owner of the Switchyard Site, even though the City Clerk's legal counsel stated that "it appears the City Clerk is obligated to sign and issue the requested certificate."

-16-

95.     Defendant Nicastro's outrageous justification for ignoring the law was revealed in a confidential e-mail exchange obtained in discovery in one of the many serial lawsuits that the defendants have forced the plaintiffs to finance and litigate: "the applicants have a remedy: litigate."

96.     When the City Clerk ultimately issued the certificate of constructive approval of the subdivision plan, as it had to under the law, the Planning Board nonetheless, lawlessly, and consistent with the Mayor and the City Council's directives, attempted to rescind the constructive approval without legitimate justification of any kind.

**STEP 8:  Make The Project Die of Thirst**

**A.     First:  Refuse Access to <u>Drinking</u> Water**

97.     The Project needs two kinds of fluids to survive.

98.     It needs regular tap water (municipal drinking water) for its employees to drink, to run the kitchen faucets, and to operate flush toilets at the facility.

99.     It also needs water of any kind, either clean or wastewater, to cool the gas fired turbines that produce the electrical energy.

100.    As landowners in America, plaintiffs have a well-established right to non-discriminatory access to municipal water sources.  It is fundamental that a municipality cannot deny reasonable access to this essential resource necessary to the enjoyment of one's property.

101.    In November 2009, the plaintiffs requested access to municipal drinking water for use at the proposed facility.

102.    The City Water Commission, initially acting outside the control of the Mayor and City Council, correctly approved the plaintiffs' request one month later in December 2009.

103.    The approval was set to expire in May 2010 and would need to be routinely renewed if the Project was not fully permitted by the expiration date.

104.    When the City Council learned of the initial approval by the independent Water Commission, it became incensed and threatened in a letter to eliminate ("delete") the Water

Commission as a municipal entity altogether unless the Project's drinking water approval was withdrawn.

105.    The Chairperson of the Water Commission resigned in protest.

106.    The City Council subsequently over a period of months proceeded to remove and replace a majority of the Water Commissioners who voted to approve drinking water for the Project's employees and staff.

107.    Meanwhile, as this effort to remove and replace the independent Water Commissioners was underway, the Project, as anticipated, submitted its standard request for an extension of the initial approval prior to the May 2010 expiration date set by the Water Commission.

108.    Although such requests are routinely allowed by the Water Commission as a matter of historical precedent, in this instance involving the Project, the Water Systems Manager disregarded standard procedures and summarily (without any basis whatsoever) denied the Project an extension of its drinking water approval.

109.    This same Water Systems Manager acknowledged publicly that the City had no non-discriminatory basis to deny the Project's application for drinking water.

110.    There also was no non-discriminatory basis for the City to deny the Project's request for a routine extension of the approval.

111.    The Water Systems Manager, acting under color or law, impermissibly singled out Brockton Power for this unfavorable treatment.

112.    This unfair and discriminatory treatment of plaintiffs had no rational basis and was instead due to defendants' malicious and bad faith intent to block the Project and injure plaintiffs.

**B.    Next:  Deny the Project Access to <u>Cooling</u> Water**

113.    Commercial water users have the same right to municipal water on a non-discriminatory basis as do residential property users.

114.    The Project's gas fired turbines need approximately 2 million gallons per day of cooling water.  This is exactly the same quantity that the City agreed to sell to the prior project on the identical site in the year 2000.

115.    In Brockton, there are two potential sources for that cooling water:

  i)      Treated effluent (wastewater), which is what the City agreed to sell to the prior project; and

  ii)     Potable (purified) water.

**1.      Refuse to Sell The Project <u>Treated</u> <u>Effluent</u> (Wastewater) for Cooling**

116.    Despite having unanimously agreed in February 2000 to sell Brockton's treated effluent in the same quantity to the Landowner's prior proposed project on the same site, the City Council, now intent upon killing the revived project, reversed its position and refused to sell its effluent to the Project.

117.    Months after Brockton Power submitted its proposal to the Siting Board to use treated effluent for cooling tower purposes in July 2007, the City Council tried to establish its own authority over access to the City's municipal water system by requiring that any contract for the sale of effluent be subject to its approval.

118.    On November 13, 2007, the City Council adopted an invalid amendment to Chapter 23, "Water, Sewers and Sewage Disposal," of the Revised Ordinances of the City of Brockton ("Effluent Amendment"), providing:

Section 23-45.  SALE OF USE OF INFLUENT OR EFFLUENT FROM THE WASTE WATER TREATMENT FACILITY

Any sale, use or agreement to provide or transfer the influent and/or the effluent discharge from the Waste Water Treatment Facility owned by the City of Brockton shall require approval of the City Council by a two-third (2/3) vote of the entire council.

119.    The Effluent Amendment, by imposing a supermajority (i.e., two-thirds) vote by all city councilors, violates the simple majority and quorum rules of M.G.L. c. 43, § 18, the state law setting forth the powers and duties of city councils.

120.    The City Council subsequently refused to even take a vote on the Project's proposal to purchase 2 million gallons per day of effluent wastewater.

121.    Defendants' discriminatory action in denying the Project access to the effluent wastewater is particularly egregious because:

i)      The state Siting Board, after a thorough hearing, concluded that the use of municipal recycled wastewater for cooling purposes is preferable to using municipal potable water and directed the Project to work with the City to access the effluent;

ii)     The wastewater treatment plant is directly adjacent to the Project's site and therefore a particularly convenient re-use opportunity;

iii)    There were and are no other potential buyers or users of the treated effluent and as a result the wastewater needed by the revived project is simply being dumped into the Salisbury River with zero dollars being paid to the City for it;

iv)     The Project offered to pay the financially struggling City millions of dollars in found revenue for something that was being given away (i.e., dumped in the river) for free; and

v)      To make the City's refusal even more irrational, there are neighboring municipalities interested in paying Brockton to have access to Brockton's treatment plant to process their own wastewater; by selling the wastewater to the Project, much needed capacity at the treatment plant would be freed up.

122.    Indeed, if Brockton sold the Project its desired 2 million gallons per day of effluent, it would significantly free up the treatment plant's capacity, allowing Brockton to accommodate some of its neighbors requests and make even more revenue for the City.

123.    The fact that an economically struggling city like Brockton would rather see a potential revenue stream dumped in the Salisbury River instead of sold to the Project for millions of dollars in new-found revenue (not to mention assisting its neighboring towns), speaks volumes

about the irrational lengths that the defendants have gone to discriminate against the Project and deny it essential rights of access to necessary resources.

**2.     Complete the Stranglehold by also Refusing to Sell the Project the only other Source of Cooling Fluid:  Potable Water**

124.    In combination with the various steps, under color of law, to cut off the revived Project's access to treated wastewater, the City also executed a parallel scheme to block the Project's access to the only remaining source of water -- clean, potable water from the City's municipal water supply.

125.    This "Catch 22" scenario was carried out in part by passage of an illegal (under state law) supermajority amendment specifically targeted at the Project.

126.    Indeed, on April 28, 2008, the City Council attempted to block the Project's access to municipal drinking water by granting itself veto power over *any* request for cooling water by the Project.  This discriminatory amendment requiring a two-thirds vote of the City Council to approve any connection to the municipal drinking (potable) water system was specifically targeted at the Project, despite being worded generally to impose the requirement for any project "that is estimated to exceed one million gallons per day" (the "Water Amendment").

127.    There currently are no water accounts in the City of Brockton that use more than one million gallons per day of water for cooling or otherwise.

128.    The Project is the only potential water user in the City of Brockton that proposes to use more than one million gallons per day.

129.    In taking this discriminatory action against the Project, the City Council disregarded state procedural requirements, in addition to well established state law that citizens and businesses in a city have equal rights to access the public municipal water supply on a non-discriminatory basis.

130.    In addition to the City Council defendants' discriminatory attempt to deny the Project water by passing the Water Amendment, defendants have conspired to deprive the Project of water through their submissions to the state Siting Board.

131.    The defendants made written and oral representations (including through a Project-opposition group) to the state Siting Board on September 22, 2011, to the effect that the sale of two million gallons of water to the Project would have a negative impact on the City's ability to manage its water resources.

132.    As recently as the City Council meeting on September 19, 2011, however, the City openly sought to find a large scale buyer for precisely the same amount of water.

133.    In other words, defendants refuse to sell water to the Project while at the same time they are actively soliciting other similarly situated large water users to purchase precisely the same amount of water.

**STEP 9:  Try to Take the Plaintiffs' Land by Eminent Domain**

134.    City officials also have undertaken discriminatory efforts to deprive plaintiffs of their rights by seeking to implement a taking of the Project land outright by eminent domain.

135.    As early as 2008, certain City officials, including defendants Balzotti and Stewart, pressured City employees to invent a pretextual reason to take the Project's land by eminent domain, seeking to use public funds to block the Project.

136.    According to records revealed in discovery, these City officials made a concerted effort to "unearth some legitimate public use for the [Project's] land" even after they were advised by City counsel that this was an "uphill task" and, absent any legitimate "public need for the property," it would be exposed as "merely a pretext to blocking the plant."

137.    This targeted action by the City against the Project was per se discriminatory because the City had never before undertaken efforts to take private landowners' property by eminent domain without a legitimate public need.

138.    Defendants impermissibly singled out plaintiffs for this discriminatory treatment.

139.    This unfair and discriminatory treatment of plaintiffs had no rational basis and was instead due to defendants' malicious and bad faith intent to block the Project and injure plaintiffs.

**STEP 10:  Appeal Everything No Matter How Frivolous, and Force the Project to Engage in Serial Litigation**

140.    The City has carried out its bad faith, malicious efforts to thwart the Project by raising frivolous, "legally untenable," and dilatory claims and defenses, as well as pursuing appeals even after administrative and judicial determinations that their positions have no merit.

141.    One example of the City's strategy to force the Project to engage in serial litigation involves the City's denial of the Project's building permit application to construct a switchyard control building in Zone I-3, an industrial zone in which "public utility services and structures" are principal uses permitted as of right.

142.    The Building Inspector denied the permit by letter, claiming that "the proposed use of the building does not fall under the allowed uses of the zone (I-3)...."

143.    The Project appealed to the Brockton Zoning Board of Appeals (the "ZBA"), which issued a decision upholding the Building Inspector's denial.

144.    The Project then appealed to the state Land Court which, in a detailed ruling issued from the bench at oral argument on October 6, 2011, and by written order dated November 23, 2011, annulled the ZBA's decision because it was based on "legally untenable grounds."

145.    In another instance, as described more fully above, the City forced the Project to seek judicial intervention after it refused to allow technical review of the Project's site plan application for the Generator Site.

146.    Another Justice of the Land Court issued the extraordinary relief of mandamus in favor of the Project and ordered the Planning Board to proceed with its review, stating in a decision issued on August 19, 2011: "[t]he Planning Board has no valid reason not to consider issuing a conditional approval."

147.    An additional example of the City's abuse of process is its refusal to issue an Order of Conditions for the Generating Site pursuant to the Wetlands Protection Act, G.L. c. 131.

§ 40, and the regulations at 310 CMR 10.00, based upon pretextual grounds.  Brockton Power was forced to appeal the denial to the DEP seeking a Superseding Order of Conditions ("SOC").

148.    The DEP rejected the City's arguments and issued an SOC approving the Project. Undeterred, the City appealed the SOC for an adjudicatory hearing, at which the DEP Commissioner upheld the SOC in favor of the Project and issued a Final Order of Conditions.

149.    Still refusing to accept the valid approval for the Project, the City appealed the Final Order to the Superior Court.

150.    The Superior Court also rejected the City's arguments by order dated February 4, 2011.

151.    The City then appealed the Superior Court's decision.

152.    On May 22, 2012, the Massachusetts Court of Appeals affirmed the judgment of the Superior Court.

153.    The City's abuse of process through its baseless positions has been cynically designed to exhaust the resources of the Project and impair the Project's ability to secure financing.

154.    Upon information and belief, the City has not subjected any other commercial landowner seeking to develop its property to serial litigation in order to protect its rights.

155.    The cumulative impact of this systematic abuse of process has caused substantial damage to the Project.

**STEP 11:  Trap the Project with "Catch 22" Situations**

156.    Defendants' harassment and coercion of the plaintiffs also has taken the form of several "Catch 22" scenarios in which one City Board refuses to act until another City Board has acted, but then the other City Board refuses to act, causing a situation where no action can occur without judicial intervention to stop the circular stalemate.

157.    For example, the Planning Board has refused to allow technical review of the Project's site plan application until the Conservation Commission issued a Wetland Permit,

while at the same time the Conservation Commission took the position that it would deny the Project's application for a Wetland Permit because the Project had not applied for the site plan approval from the Planning Board.

158.    In other words, the Planning Board says wait for the Conversation Commission decision and the Conservation Commission says wait for the Planning Board decision.

159.    To add insult to injury, the Planning Board continued to maintain that it was justified in not processing the Project's application for a site plan approval even after the Project obtained judicial approval of the Wetland Permit that the Planning Board had refused.

160.    The defendants even pressed their contradictory, illogical positions in two separate courts on the exact same day.

161.    Specifically, on August 26, 2010, the City and the Planning Board argued to the Land Court that the Planning Board was within its rights to refuse the Project's site plan application because the Conservation Commission had not yet issued the Project a Wetland Permit.

162.    The City told the Land Court that the Project itself could resolve the delays in the Wetland Permit litigation because it "could take actions to move the appeal of the Wetland Permit [in the Superior Court] forward."

163.    However, what the Defendants did not tell the Land Court was that, on that very same day, they were filing a motion to stay the very same Superior Court action (on the Wetland Permit) that they were pointing to as being able to move the process forward.

164.    In another example, the City argued to the Land Court that it should not grant mandamus relief to the plaintiffs (for the City's refusal to process the Project's applications) because they had a "second remedy in the form of a petition to the state Siting Board."

165.    The Land Court rejected the City's disingenuous argument, finding that the state Siting Board's appeal process "cannot be considered an adequate remedy" for plaintiffs.  Indeed, the Land Court pointedly stated that the "purpose of mandamus is not well served by merely

diverting [plaintiff] from one governmental body that will <u>not</u> <u>do</u> <u>its</u> <u>duty</u> [i.e., the Planning Board] to another body that will [i.e., the state Siting Board]." (Emphasis added.)

166.    When the Plaintiffs ultimately went to the state Siting Board after the City's disobedience of the Land Court's mandamus order, the City cynically reassured the Siting Board that it would fairly process the Project's future applications knowing that the City had no such intention.

### STEP 12:  Retaliate Against Project Supporters and Advisors

167.    Another aspect of the conspiracy to kill the Project involves the efforts of defendant Mayor Balzotti to retaliate against the Project by making its local counsel, advocate, and adviser "radioactive" in the Brockton business community.

168.    Mayor Balzotti told certain business owners in Brockton that they should not use Brockton Power's adviser as their own representative because of his affiliation with the Project.

169.    This action by Mayor Balzotti was designed to reinforce a pattern of discrimination by depriving Brockton Power of the value and services of its carefully chosen consultant and advisor and undermining the Project's credibility, access, and representation before regulatory bodies of the City.

170.    The Mayor impermissibly singled out Brockton Power for this discriminatory treatment, and tortiously interfered with the Project's business relationships.

171.    This unfair and discriminatory treatment of Brockton Power had no rational basis and was instead due to defendants' malicious and bad faith intent to block the Project and injure plaintiffs.

### STEP 13:  Ignore Conflicts of Interest and Recusal Rules Such That the Founding Member of a Project Opposition Group Presides Over the Decision-Making on Project Applications

172.    Certain City officials who are avowed public opponents of the Project have repeatedly failed to make required recusals under the Massachusetts conflict of interest law,

instead continuing to use their positions of power to make adverse and illegal decisions related to the Project.

173.    One of the most egregious conflict examples involves Planning Board member and defendant Nicastro's direct official actions against the Project in her official capacity despite admitting to personally investing at least ***fifteen thousand dollars*** ($15,000) of her own personal funds in opposition to the Project.

174.    Defendant Nicastro, charged with official responsibility for reviewing and approving development projects in the City, is a founding member of, attorney of record for, and major financial contributor to the Alliance Against Power Plant Location ("AAPPL"), a group specifically formed by her to oppose the Project.

175.    Evidencing her awareness of the impropriety and illegality of her actions, defendant Nicastro has attempted to deny that she acted in any capacity as a lawyer for AAPPL.

176.    Her correspondence related to AAPPL contradicts her denials.

177.    In addition to her work as an attorney and investor in an opposition group to block the Project, defendant Nicastro also has submitted filings to the state authorities in opposition to the Project, claiming that it "***will substantially and particularly affect***" her and her family and the value of her property.

178.    Despite this openly acknowledged personal financial interest in opposing the Project, defendant Nicastro continued to take official actions obstructing the Project without any recusal.

179.    In fact, although she has actively worked to kill the Project, defendant Nicastro participated, presided over, and directed Planning Board hearings and activities involving the Project -- including taking many of the unilateral actions outlined above such as trying to block the filing of the preliminary subdivision plan for the Project without any lawful basis.

180.    To allow someone who personally invested substantial funds in support of opposition to the Project to play an active, decision-making role in regulatory rulings regarding the Project is fundamentally unfair, denies the plaintiffs due process of law, and violates the

state's conflict of interest statutes designed to protect Massachusetts citizens from just such deprivations of civil rights.

181.    While defendant Nicastro may have every right to oppose the Project, support and fund opposition to it, and take private actions to thwart it, what she cannot do is use her official position as a member of the Planning Board (with regulatory oversight powers over the Project) to protect her investment in the opposition effort.  To do so is to act unfairly as both judge and jury over the Project notwithstanding her manifest personal stake in the outcome, thus denying plaintiffs due process of law.

182.    Each of the defendants, at various times, acting both individually and in concert with others, actively participated in efforts to deny plaintiffs of their rights to due process and equal protection of the laws, and did so knowing that their actions were wrongful and intended to injure plaintiffs in the lawful development of their property.

## COUNT I
### (Violations of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution -- Due Process)

183.    Plaintiffs reassert and reallege the above paragraphs.

184.    Defendants, under color of law, have violated plaintiffs' constitutionally protected property rights as secured under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

185.    By manipulating and abusing their land use power to block the Project, defendants have deprived plaintiffs of the enjoyment of their constitutionally protected property rights without due process of law.

186.    Defendants have intentionally and wrongfully singled out plaintiffs for adverse treatment relating to their protectable and legitimate interests in the Project and their property.

187.    Defendants' adverse treatment of plaintiffs was arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the Project and injure plaintiffs.

-28-

188.    Defendants' intentional misconduct has violated plaintiffs' procedural due process right to a land use review process that is non-discriminatory, unbiased, reasonably expeditious, and fair.

189.    Defendants' intentional misconduct has violated plaintiffs' substantive due process right not to be deprived of the use of their property except by laws, regulations, or government actions that are rationally related to a legitimate governmental interest.

190.    Plaintiffs have suffered injuries as a result of the defendants' wrongful acts and omissions for which the defendants are liable under provisions of 42 U.S.C. § 1983 in an amount to exceed $68 million.

## COUNT II

### (Violations of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution -- Equal Protection)

191.    Plaintiffs reassert and reallege the above paragraphs.

192.    Defendants, under color of law, have violated plaintiffs' constitutionally protected property rights as secured under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

193.    The defendants' disparate treatment of plaintiffs, including their discriminatory, arbitrary and capricious handling of plaintiffs' applications for permits and other regulatory approvals, has denied plaintiffs their right to equal protection of law.

194.    Defendants have intentionally and wrongfully singled out plaintiffs for adverse treatment relating to their protectable and legitimate interests in the Project and their property.

195.    Defendants' adverse treatment of plaintiffs was arbitrary and irrational, without authority under the law, and motivated by malicious and bad faith intent to block the Project and injure plaintiffs.

196.    Defendants' actions and statements have violated plaintiffs' right to equal protection of the laws as guaranteed under the United States Constitution.

197.    Plaintiffs have suffered injuries as a result of the defendants' wrongful acts and omissions for which the defendants are liable under provisions of 42 U.S.C. § 1983 in an amount to exceed $68 million.

### COUNT III
**(Tortious Interference With Business Relations)**

198.    Plaintiffs reassert and reallege the above paragraphs.

199.    The individual defendants knew about and intentionally interfered with plaintiffs' advantageous business relations with the City of Brockton.

200.    All defendants knew about and intentionally interfered with plaintiffs' advantageous business relations with each other.

201.    This interference was accomplished using improper means and/or inspired by improper motives.

202.    Plaintiffs were harmed, and continue to suffer harm, as a result of defendants' actions.

203.    Plaintiffs have suffered injuries as a result of the defendants' wrongful acts and omissions for which the defendants are liable in an amount to exceed $68 million.

### COUNT IV
**(Conspiracy)**

204.    Plaintiffs reassert and reallege the above paragraphs.

205.    As described above, defendants acted in concert and joined together in an unlawful and unfair manner, pursuant to a common design to threaten, coerce, intimidate, injure and defame plaintiffs.

206.    Each defendant knew or in the exercise of reasonable care should have known about the conduct of the others and about the common tortious scheme.

207.    Each defendant gave substantial assistance and/or encouragement to the other defendants, with the knowledge that this assistance contributed to the common plan to defame

plaintiffs, to violate plaintiffs' constitutional right to use and enjoy their property, and to interfere with plaintiffs' business relations.

208.    As a result, each defendant is responsible for the defamatory, tortious, and wrongful acts of the other defendants.

209.    As a direct and proximate result of the defendants' conspiratorial acts, plaintiffs have been prevented from their efforts to develop the Project and enjoy their fundamental property rights, and have suffered substantial monetary losses.

210.    Defendants are each jointly and severally liable in damages to plaintiffs.

211.    Plaintiffs have suffered injuries as a result of the defendants' wrongful acts and omissions for which the defendants are liable in an amount to exceed $68 million.

## COUNT V
### (Abuse of Process)

212.    Plaintiffs reassert and reallege the above paragraphs.

213.    As described above, defendants have wrongfully used the litigation process in their efforts to delay and ultimately block the Project.

214.    Defendants' wrongful and ulterior motives in pursuing litigation against plaintiffs includes their desire to delay and block the Project, in addition to their desire to exhaust the resources of the Project and impair its ability to secure financing.

215.    As a direct and proximate result of the defendants' wrongful abuse of process, plaintiffs have suffered injuries for which the defendants are liable in an amount to exceed $68 million.

## COUNT VI
### (Unlawful Denial of Public Right to Access Municipal Water System)

216.    Plaintiffs reassert and reallege the above paragraphs.

217.    Brockton Power is entitled to have reasonable access to the municipal water system, including to purchase treated effluent, to operate its proposed electric generation facility.

218.    Brockton Power's request for access to the municipal water system, including to purchase treated effluent from the City's Advanced Water Reclamation Facility, does not burden the City in any way, nor does it violate the interest of the public.

219.    To the contrary, Brockton Power's proposed purchase of effluent would bring substantial environmental and economic benefits to the City and surrounding communities.

220.    Defendants have improperly denied Brockton Power access to Brockton's municipal water system by refusing to sell treated effluent to Brockton Power.

221.    Brockton Power has suffered, and continues to suffer, economic harm as a result.

<u>COUNT VII</u>
**(Declaratory Relief)**

222.    Plaintiffs reassert and reallege the above paragraphs.

223.    An actual controversy exists between plaintiffs and defendants with respect to whether certain votes taken by the City Council to pass ordinances and resolutions related to the Project are valid.

224.    Specifically, the plaintiffs challenge and the defendants assert the validity of the following actions taken by the Brockton City Council:

  a.    the Effluent Amendment to the Zoning Ordinance on September 24, 2007;

  b.    the Water Amendment to the Zoning Ordinance on April 28, 2008;

  c.    the February 2010 "Resolution," directing the "immediate and complete halt on all deliberations concerning the siting of a power plant in Brockton";

  d.    the removal of electric power generating facilities as a permitted use in the City's I-3 zone on January 13, 2009; and

  e.    the elimination of the ability to construct "sound attenuation walls" in the City's I-3 zone on June 28, 2010.

225.    An actual controversy also exists between plaintiffs and defendants with respect to whether defendants' actions, as outlined above, violate plaintiffs' constitutional rights.

226.    These controversies threaten to cause, have caused, and will continue to cause damage to plaintiffs.

227.    These controversies are ripe for adjudication.

228.    Plaintiffs have not made a prior application for the relief sought herein to this Court or any other court.

## COUNT VIII
### (Injunctive Relief Pursuant to 28 U.S.C. §§ 1651 and 1983)

229.    Plaintiffs reassert and reallege the above paragraphs.

230.    Plaintiffs have been irreparably injured as a result of the deprivation of their constitutional rights by the defendants.

231.    As plaintiffs do not have an adequate or complete remedy at law to redress the violations of their constitutional rights as outlined above, this suit for injunction, declaratory judgment, and damages is their only means of securing complete and adequate relief.

232.    No other remedy would offer plaintiffs complete protection from the continuation of defendants' unlawful and unconstitutional acts, policies and practices.

233.    By their longstanding hostility and bias against the Project, defendants have demonstrated that, without the imposition of injunctive relief, the continuation of proceedings before the City, the City Council, and the various City boards and commissions, will be interminable and futile.

234.    Considering the balance of hardships between plaintiffs and defendants, the requested remedy in equity is warranted, and the public interest would be served by the requested injunction.

235.    For these reasons, plaintiffs ask the Court:

            a.      To order defendants to issue all permits, licenses, variances, and other authorizations necessary to allow Brockton Power to proceed with the Project.

            b.      To order defendants to enter into a final agreement concerning the purchase of treated effluent by Brockton Power.

c.      To order defendants to refrain from impeding, delaying, or interfering with plaintiffs' rights or the development of the Project.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs Brockton Power Company LLC and Brockton Power LLC respectfully request that this Court:

1.      Enter judgment on each and every Count of the Complaint in their favor and award them damages in excess of $68 million or such amount as may be proven at trial and so assessed by the jury against each defendant, jointly and severally;

2.      Declare the City Council's Effluent Amendment to the Zoning Ordinance dated September 24, 2007, to be invalid;

3.      Declare the City Council's Water Amendment to the Zoning Ordinance dated April 28, 2008, to be invalid;

4.      Declare the City Council's February 2010 "Resolution," directing the "immediate and complete halt on all deliberations concerning the siting of a power plant in Brockton," to be invalid and unlawful;

5.      Declare the City Council's January 13, 2009, amendment of the Zoning Ordinance to remove electric power generating facilities as a permitted use in the City's I-3 zone to be invalid;

6.      Declare the City Council's June 28, 2010, amendment of the Zoning Ordinance to eliminate the ability to construct "sound attenuation walls" in the City's I-3 zone to be invalid;

7.      Order the defendants to issue within thirty (30) business days the building permits and other licenses and authorizations necessary to allow Brockton Power to proceed with the Project;

8.    Order the defendants to approve the proposed purchase of treated effluent by Brockton Power, and authorize the City to negotiate and enter into a final agreement with Brockton Power concerning that purchase;

9.    Order the defendants to cease and desist and refrain from impeding, delaying or interfering with plaintiffs' rights and the development of the Project;

10.    Order the defendants to pay plaintiffs' reasonable costs and attorneys' fees; and

11.    Grant such other and further relief as may be just and appropriate.


PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.


BROCKTON POWER LLC and
BROCKTON POWER COMPANY LLC,
By their attorneys,

Dated: June 12, 2012

BINGHAM McCUTCHEN LLP
Mark E. Robinson, BBO #423080
Siobhan E. Mee, BBO #640372
Deana K. El-Mallawany, BBO #674825
Caleb Schillinger, BBO #676592
One Federal Street
Boston, Massachusetts  02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736