UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
                                        )
BROCKTON POWER LLC, et al.,             )
                                        )
        Plaintiffs,                     )
                                        )
v.                                      )       Civil No. 12-11047-LTS
                                        )
CITY OF BROCKTON, et al.,               )
                                        )
        Defendants.                     )
_____ )

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

May 30, 2013

SOROKIN, C.M.J.

        The plaintiffs are developers who wish to build an electric power generating facility on

land they own in Brockton, Massachusetts ("the City").  They have sued the City, its planning

board and city council, and seven of its present and former officials, alleging violations of 42

U.S.C. § 1983 and state law based on a "conspir[acy] to systematically deprive [the] plaintiffs of

[various] constitutional rights," including "the right to develop their land."  Doc. No. 48 at ¶ 2.

All defendants except the City and its planning board have moved to dismiss the complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]  Doc. Nos. 54, 58, 60, 62, 64.

For the reasons that follow, the pending motions are DENIED.

_____

        [1]The Court will refer to the defendants who have filed motions to dismiss as "the moving
defendants"; any references herein to "the defendants" more generally are intended to encompass
all named defendants.

I.      BACKGROUND

The facts set forth below are taken from the Amended Complaint, Doc. No. 48, and

certain exhibits submitted by individual defendants in connection with their motions, Doc. Nos.

59-1, 59-2, 63-1, 76-1.[2]  This does not constitute a finding by the Court that any or all of the

facts alleged are true.  At this stage of the proceedings, the law requires the Court to accept the

plaintiffs' allegations as true and to draw all reasonable inferences flowing therefrom in the

plaintiffs' favor.  Watterson, 987 F.2d at 3.

        A.      The Parties and the Project

The plaintiffs are Brockton Power LLC and Brockton Power Company LLC ("Brockton

Power").  The former is run by Dennis and Leo Barry ("the Barry Brothers"), and it owns land

on Oak Hill Way in Brockton ("the Generator Site").  Doc. No. 48 at ¶ 17.  The latter, backed by

energy investors including Siemens Corporation, has "a binding option to purchase the

Generator Site" and also owns a second piece of land nearby ("the Switchyard Site").  Id. at

¶¶ 18, 36.

The defendant entities are the City, the Planning Board, and the City Council.[3]  Id. at

---

[2]The four identified exhibits are public records (two final decisions of the Massachusetts
Energy Facilities Siting Board, a Brockton City Council Resolution, and a Massachusetts Land
Court decision), and the plaintiffs have not disputed their authenticity or otherwise objected to
their submission.  See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  Three other exhibits,
however, are letters.  Doc. Nos. 59-3, 59-4, 59-5.  As they are not "public records," "documents
central to plaintiffs' claim[s]," or documents "referred to in the complaint," consideration of
them is inappropriate at this stage.  Watterson, 987 F.2d at 3.

[3]The City and the Planning Board have answered the complaint.  Doc. No. 53.  The City
Council argues it is not a proper defendant because it is not a legally separate entity from the
City itself.  See Doc. No. 63 at 9-10.  At oral argument, the lawyer representing the City Council
did not pursue this issue, stating it made little difference whether the City Council were
dismissed from the case.  For that reason, the Court will not dismiss the City Council now.

¶¶ 19-21.  The individual defendants are Brockton's current mayor, Linda Balzotti; Balzotti's

predecessor, James Harrington, who was mayor through the end of 2009; City Council members

Thomas Brophy, Michelle DuBois, and Jass Stewart; the Planning Board chairperson, Wayne

McAllister; and Planning Board member Susan Nicastro.  Id. at ¶¶ 22-28.  Each individual

defendant lives in Brockton.  Id.

 In the late 1990s, the Barry Brothers, along with a project developer from Brockton,

began plans to build an electric power generating plant on the Generator Site.  Id. at ¶¶ 30, 33.

The Generator Site was zoned for industrial uses, including such a plant.  Id. at ¶ 31.  By May

2000, the Barry Brothers had received necessary permits from the Brockton Zoning Board of

Appeals, the Conservation Commission, and the Department of Public Works.  Id. at ¶ 34.  They

also had obtained approvals for access to drinking water at the facility, and an agreement to

purchase "2 million gallons of effluent cooling water per day" from "the City's wastewater

treatment plant," which is adjacent to the Generator Site.  Id. at ¶¶ 34, 136(ii).  The Barry

Brothers abandoned the project, however, due to economic concerns following the Enron

bankruptcy.  Id. at ¶ 35.

 In late 2006, Brockton Power sought to pick up where the Barry Brothers had stopped,

initiating a new plan to develop an electric power plant on the Generator Site, and to connect it

to the National Grid regional transmission line via the Switchyard Site.  Id. at ¶¶ 36, 39.  Along

with an option to purchase the Generator Site, the Barry Brothers "assigned to Brockton Power

their rights and assets under all contracts and prospective contracts relating to the development

of an electric generation facility on the Generator Site."  Id. at ¶ 37-38.  Based on this

assignment, Brockton Power anticipated "an advantageous business relationship with the City,"

which it hoped would include agreements to supply power to the City and to obtain drinking and cooling water from the City.  Id. at ¶ 42.

The plaintiffs expect the project to prove beneficial to the region, not only economically, but also because it would "meet the region's growing energy needs" and help prevent "devastating interruptions and blackouts that have increasingly occurred in the New England power grid."  Id. at ¶¶ 5, 270.  Since at least 2007, the project has been subjected to intense scrutiny by, and has won support from, state-level agencies including the Massachusetts Energy Facilities Siting Board ("the Siting Board") and the Department of Environmental Protection ("DEP").  Id. at ¶¶ 6-7; see Doc. No. 59-1.  After reviewing extensive submissions, holding lengthy hearings related to the project, and carefully considering questions like site selection, environmental impacts, and relevant state energy policies, the Siting Board has formally approved the project, subject to compliance with local zoning and permitting procedures, and the DEP has issued an air permit authorizing the proposed facility at the designated site.  Doc. No. 48 at ¶ 7; Doc. Nos. 59-1, 59-2.

Any hopes of an advantageous relationship with the City, however, were extinguished – and the effect of the state agency approvals undermined – when the defendants "orchestrated [a] scheme to destroy the Project . . . with improper motive and in bad faith."  Doc. No. 48 at ¶ 45. Almost from its inception, the project was plagued by a conspiracy in which each individual defendant knowingly and actively participated, id. at ¶ 46, "motivated by personal and political animus against the Project" and the plaintiffs, id. at ¶ 8.  Pursuant to the alleged conspiracy, the defendants endeavored to "reject, deny and starve" the project in order "to fatally delay and ultimately kill" it.  Id. at ¶¶ 8, 46.  To accomplish this, the defendants employed a number of

strategies, including: improper attempts to change applicable zoning regulations; refusal to process, or summary denial of, necessary review and approval of project plans and applications, without regard for applicable regulations and legal standards; discriminatory efforts to prevent the plaintiffs from gaining access to drinking and cooling water; persistent litigation and manipulation of state agency and court proceedings; total disregard for repeated warnings from the City's legal counsel; and stringent, public opposition to the project and its proponents.  Id. at ¶¶ 46-49.  According to the plaintiffs, such measures are extraordinary, and are not merely reflective of good-faith disagreement among the parties regarding the interpretation and application of relevant ordinances and procedures, or ordinary exercise of discretion by municipal bodies.  Indeed, the plaintiffs allege that no other developer of a project in the City has had to endure a targeted campaign like the one visited upon the plaintiffs here.  See id. at ¶¶ 68, 92, 122, 157, 187.

B.    Zoning Changes

Both the Generator Site and the Switchyard Site are within an area designated as an "I-3 heavy industrial zone."  Id. at ¶¶ 31, 54; see Doc. No. 76-1 at 2 (noting the land is "within the Oak Hill Industrial Park").  When the plaintiffs acquired the Sites, electric power generating facilities had been a "principal permitted use" in the City's I-3 zones for decades.  Doc. No. 48 at ¶¶ 31, 54.  On January 13, 2009, well after Brockton Power set out to develop its power plant, the City Council voted to eliminate electric power generating plants as a permitted use in the City's I-3 zones.  Id. at ¶ 54.  According to the plaintiffs, this was an effort to "unilaterally target[]" them.  Id. at ¶ 53.  The effort was unsuccessful, id., as the defendants concede that the 2009 zoning change could not legally impact "the plaintiffs' right to build a power plant in an I-3

zone." Doc. No. 63 at 7 n.9.

Nearly a year and a half later, however, the City Council again attempted to undermine the plaintiffs' ability to proceed with the project by adopting another change to the relevant zoning regulations, this time entertaining a proposal to ban "sound attenuation walls" such as those Brockton Power had included in project designs then under review by state agencies. Doc. No. 48 at ¶ 57. According to the plaintiffs, the sole objective of this proposed zoning change was "to prevent [them] from using their property for the 'principal permitted use' for which they bought it," and to "destroy[]" the plaintiffs' "expectations in developing their land." Id. at ¶ 57.

Days before the City Council voted to approve the ban on sound attenuation walls, and in an effort to escape the reach of such a change, the plaintiffs submitted to the Planning Board a detailed preliminary subdivision plan for the Generator Site. Id. at ¶¶ 75, 78, 81. The submission, if deemed to comply with local regulatory requirements, would effect a "zoning freeze" under state law and prevent subsequently enacted changes to zoning regulations from impacting the project. Id. at ¶¶ 76-77. Officials in the Planning Department acting outside the alleged conspiracy initially accepted the plaintiffs' submission as "fully conform[ing] to the rules [and] regulations." Id. at ¶ 79.

Realizing such an acceptance would nullify the conspirators' efforts by rendering the impending zoning change inapplicable to the plaintiffs, defendants Nicastro and McAllister intervened to "pretend[] that [the plan] had not been properly filed," id. at ¶ 84, and "fabricate[] reasons why [it] purportedly did not meet the regulatory requirements," id. at ¶ 85, in a concerted attempt to prevent a zoning freeze before the City Council's scheduled vote, id. at ¶¶ 80-82, 84, 86-88. They then went to extraordinary lengths to ensure the Planning Board would endorse

their pretextual rejection by: preventing other members of the Planning Board from becoming fully informed about their improper efforts to reject the plaintiffs' subdivision plan (or about the submissions themselves); ensuring the plan was excluded from public notices regarding an upcoming Planning Board meeting; and preventing the Barry Brothers' representative from speaking at the meeting when the plan was discussed.  Id. at ¶¶ 90, 91, 96.

The steps taken by Nicastro and McAllister were successful; the Planning Board voted on August 5, 2010 to reject the preliminary subdivision plan.  See id. at ¶ 98.  The plaintiffs sought review in the Land Court, where the City eventually acknowledged the illegality of the rejection and entered a stipulated judgment annulling the Planning Board's decision (and, thus, granting the plaintiffs their desired zoning freeze) in February 2012.  Id. at ¶¶ 98-100.  So for a second time, efforts to enact targeted zoning amendments intended to undermine the project failed.  Undaunted, however, the defendants resorted to other means of accomplishing the same goal.  See §§ I(C)-(F), infra.

C.      Summary Rejection of Project Submissions

The Planning Board's attempt to reject the preliminary subdivision plan was not the only instance in which project submissions were summarily or improperly rejected, forcing the plaintiffs to seek redress in state court.  The plaintiffs cite at least four other examples of such conduct by various defendants acting pursuant to the alleged conspiracy.  First, at the direction of defendant Harrington, a "statutorily required" and previously scheduled technical review of a plan for the Generator Site was improperly refused in October 2009.  Id. at ¶¶ 154-56.  This occurred despite the advice of legal counsel, who had specifically warned against "unwarranted delays" and "acting outside the rules" in the technical review process.  Id. at ¶¶ 177-78.  It also

was inconsistent with previous testimony by the City's Building Inspector that the technical review process would not be used to delay the project.  Doc. No. 76-1 at 2; <u>see</u> Doc. No. 48 at ¶¶ 152-53.  The plaintiffs sought mandamus, which the Land Court granted, concluding that there was "no valid reason not to" proceed with the technical review.  Doc. No. 48 at ¶¶ 232-33; Doc. No. 76-1 at 11; <u>see also</u> Doc. No. 76-1 at 9 (finding "the Planning Board has introduced an unreasonable condition [precedent to technical review] at nearly the earliest possible point in the application process").

Next, in February 2010, the City Council passed a resolution "specifically targeted at Brockton Power," <u>id.</u> at ¶ 64, requesting "an immediate and complete halt on all deliberations concerning the siting of a power plant in Brockton," Doc. No. 63-1.  During the year preceding the City Council's adoption of this resolution, the plaintiffs' project was the only power plant proposal being pursued in Brockton.  Doc. No. 48 at ¶ 56.  Although the resolution facially cites an explosion at a Connecticut power plant as the impetus for its enactment, the plaintiffs allege it was an "extraordinary, one-of-a-kind" measure "animated by defendants' specific and bad faith intent to block the Project and deprive plaintiffs of their rights."  Doc. No. 48 at ¶¶ 63, 69.  The resolution "institutionalized within the City a land-use policy and regulatory regime" that furthered the aim of the alleged conspiracy by "depriv[ing] the plaintiffs of all economically beneficial use of their land" and "declaring a complete moratorium on power plant consideration by legislative fiat."  <u>Id.</u> at ¶¶ 65-66.  Furthermore, Mayor Balzotti has reinforced the resolution by "publicly and privately prounounc[ing] the official City policy against the Project," and "instructing City officials and employees to carry out this policy."  <u>Id.</u> at ¶ 71.  It appears as though the resolution was unprecedented and remains in effect today.  <u>Id.</u> at ¶ 68; <u>see</u> Doc. No.

68 at 37.

Third, consistent with the "no action" resolution, Nicastro and other defendants instructed the City's Building Superintendent "on how to anticipatorily deny building permit applications that the Project had yet to even submit."  Doc. No. 48 at ¶ 162 (emphasis omitted). Following those directions, the Building Superintendent denied the plaintiffs' application for a building permit necessary to develop the Switchyard Site, claiming the proposed switchyard control building was beyond "the allowed uses of the zone (I-3)."  Id. at ¶¶ 228-29.  Although the Brockton Zoning Board of Appeals upheld the denial, the plaintiffs prevailed in their appeal to the Land Court, which concluded the local zoning decision was based on "legally untenable grounds."  Id. at ¶¶ 230-31.[4]  Relatedly, Nicastro "instructed the City Clerk not to issue a certificate of constructive approval . . . for the Switchyard Site," despite legal counsel's advice to the contrary, explaining that the plaintiffs would have to "litigate" to obtain the certificate.  Id. at ¶¶ 103-04.  Litigation was unnecessary in this instance, however, because the City Clerk did issue the certificate, and efforts by the Planning Board to rescind it were unsuccessful.  Id. at ¶ 105.

Finally, because part of the Generator Site is within a protected wetland "buffer zone," the plaintiffs were required to seek permission to proceed from the Brockton Conservation Commission ("BCC"), pursuant to the Wetlands Protection Act.  Id. at ¶ 234; Conservation Comm'n of Brockton v. Dep't of Envtl. Prot., 966 N.E.2d 228, 230 (Mass. App. Ct. 2012)

---

[4]The Land Court's decision was affirmed by the Massachusetts Appeals Court, and the Supreme Judicial Court denied further review.  Brockton Power Co. LLC v. City of Brockton, 978 N.E.2d 591 (Mass. App. Ct. 2012) (table), further review denied, 982 N.E.2d 1187 (Mass. 2013) (table).

(hereinafter "WPA Appeal").  The BCC denied the plaintiffs' request in October 2008, in part

because the Planning Board had not reviewed and approved the plaintiffs' site plan.  Doc. No. 48

at ¶ 234; WPA Appeal, 966 N.E.2d at 231.  The plaintiffs refer to this as a "Catch 22," noting the

Planning Board claimed its refusal to review their site plan was due to the lack of approval by

the BCC, while the BCC based its denial on the lack of approval by the Planning Board.  Doc.

No. 48 at ¶ 215.  In such a situation, "no action can occur without judicial intervention to stop

the circular stalemate."  Id. at ¶ 214.  The plaintiffs appealed the BCC's denial, and the DEP

issued an order approving the project.  Doc. No. 48 at ¶¶ 235-36.  The City unsuccessfully

challenged the DEP's decision through a further administrative hearing, and then through two

levels of review in the state courts.  Id. at ¶¶ 237-41; WPA Appeal, 966 N.E.2d at 231-32.

Nearly five years elapsed between the plaintiffs' July 12, 2007 application to the BCC and the

April 2012 conclusion of the City's appeals.

     In sum, the plaintiffs have been compelled to resort to administrative appeals and state-

court litigation at least four times in the six years since they revived the Barry Brothers' project,

in order to secure proper review and approval of necessary project applications.[5]  According to

the plaintiffs, "the City's strategy to force the Project to engage in serial litigation" and "to

expend resources pursuing protection of their rights in multiple forums on frivolous issues" has

"depriv[ed] the plaintiffs of meaningful remedies in the state courts."  Doc. No. 48 at ¶¶ 227-28,

242.

---

    [5]In fact, in their briefs and at oral argument, the plaintiffs noted they have successfully
sued the City and its agencies seven separate times in state court to date.  See Doc. No. 81 at 3.

D.    <u>Water Access</u>

A central dispute between the parties here – and one which has not been the subject of state-court litigation – involves access to municipal drinking water and other clean or waste water for cooling turbines at the proposed energy plant.  <u>Id.</u> at ¶¶ 109-10.  The City previously had granted the Barry Brothers access to both types of water for their original power plant development project.  <u>Id.</u> at ¶¶ 34, 136(ii).  It has allowed the plaintiffs access to neither.

The project will require approximately two million gallons of cooling water each day.  <u>Id.</u> at ¶ 128.  To this end, in July 2007 the plaintiffs proposed purchasing treated effluent (wastewater) from the City, just as the Barry Brothers successfully had proposed seven years earlier.[6]  <u>Id.</u> at ¶¶ 131-32.  In November 2007, however, the City Council amended a City ordinance to require approval by a two-thirds majority (rather than a simple majority) of any agreement to sell the City's treated effluent.[7]  <u>Id.</u> at ¶ 133.  Thereafter, the City Council refused to consider or vote on the plaintiffs' proposal to purchase effluent, which is generated at a water treatment plant adjacent to the Generator Site.  <u>Id.</u> at ¶¶ 135, 136(ii).  The unused effluent the plaintiffs wish to purchase is now "simply being dumped into" a nearby river.  <u>Id.</u> at ¶ 136(iii).

When they were unable to secure access to treated effluent, the plaintiffs explored the

---

[6]Although Balzotti's counsel stated at oral argument that the Barry Brothers' project had been smaller in scale, and had required less water for cooling, those suggestions are contrary to the allegations in the Amended Complaint, which control for purposes of the pending motions.  <u>See, e.g.</u>, Doc. No. 48 at 128 (alleging the amount of cooling water required by the plaintiffs "is exactly the same quantity that the City agreed to sell to the Barry Brothers for their project on the identical site in the year 2000"); <u>id.</u> at ¶ 204 (describing the two projects as "virtually identical . . . in all material respects, including location, generator size and capacity, water usage, fuel source, environmental impact, and state, federal, and local permit requirements").

[7]According to the plaintiffs, this amendment contravened state laws and procedural requirements.  Doc. No. 48 at ¶¶ 133-34.

less-desirable option of purchasing potable water from the municipal drinking water system.  Id.

at ¶ 138; see id. at ¶ 136.  The defendants, however, took similar steps to prevent such access.

First, the City Council passed another amendment – again without regard for "state procedural

requirements," and again "specifically targeted at the Project" – to require approval by a two-

thirds majority of any proposed connection to the municipal drinking water system "estimated to

exceed one million gallons per day."  Id. at ¶¶ 140-41.  Second, in September 2011 submissions

to the Siting Board, the City claimed that selling two million gallons of potable water per day to

the plaintiffs "would have a negative impact on the City's ability to manage its water resources,"

a view the Siting Board ultimately adopted.  Id. at ¶ 143; Doc. No. 59-1 at 30-32.  Nevertheless,

around the same time, the City Council and defendants Balzotti, DuBois, Stewart, and Brophy

actively and publicly "sought . . . a large scale buyer for precisely the same amount of [potable

municipal] water," in an effort "to close out the power plant."  Id. at ¶¶ 144-45; see id. at ¶¶ 198-

202.

The defendants also have obstructed the plaintiffs' access to municipal drinking water at

their proposed facility.  Id. at ¶¶ 112-22.  The City Water Commission initially approved the

plaintiffs' request for such access in December 2009.  Id. at ¶ 113.  Like many other permits

involved in a project such as this one, the drinking water approval was for a limited period of

time and "would need to be routinely renewed if the Project was not fully permitted by the

expiration date."  Id. at ¶ 114.  Upon learning of the Water Commission's initial decision,

Brophy, DuBois, and other City Councilors threatened to eliminate the Commission unless it

revoked the plaintiffs' approval, causing the Commission's chairperson to resign "in protest."

Id. at ¶¶ 115-17.  When the approval was not revoked, the City Council removed Water

Commissioners who had voted in favor of approval, then DuBois and Mayor Balzotti replaced them with individuals who would oppose the plaintiffs' future renewal applications.  Id. at ¶¶ 118-19.  Nicastro "intervened" to notify Mayor Balzotti of the plaintiffs' May 2010 request for an extension of the initial approval – the sort of request that was "routinely allowed . . . as a matter of historical precedent" – and worked "to ensure that the approval would never be extended."  Id. at ¶¶ 120-22.  Despite publicly admitting that "there was no 'legal ground to reject'" the plaintiffs' application for an extension, and that rejecting it "would constitute 'discriminating against a business,'" the Water Systems Manager "summarily" denied the extension pursuant to "the conspirators' instructions."  Id. at ¶¶ 122-23.

According to the plaintiffs, there is "no adequate state court process to redress the wrongful deprivation of . . . water access."  Id. at ¶ 147.  They remain without access to municipal drinking water, and the City Council continues to refuse any discussion of the plaintiffs' proposal to purchase treated effluent for cooling.

E.      State Agency and Court Proceedings

The defendants' concerted efforts to prevent the plaintiffs from completing the project also have included attempts to manipulate and undermine the effectiveness of proceedings before state agencies and courts.  For example, in advance of hearings before the Siting Board, Mayor Balzotti "directed the City's Building Superintendent" to "testify and work cooperatively with the Law Dep[artment] to help the city reach our goal which is to prevent the location of this facility in the city."  Id. at ¶¶ 72 (emphasis omitted), 161.  In addition, both Mayor Balzotti and DuBois prevented "pro-Project" employees of the City's water department from appearing before the Siting Board, as their anticipated testimony would have undermined the objective of

the conspiracy.  Id. at ¶ 163.

The accuracy of other representations made to the Siting Board also are belied by the defendants' actions, as mentioned above.  See, e.g., id. at ¶¶ 143-45 (alleging the City offered testimony, through Brophy, to the Siting Board stating that it could not spare the amount of potable water needed by the plaintiffs for cooling, while the City Council defendants, including Brophy, simultaneously sought a large-scale buyer to "close out" the plaintiffs); id. at ¶¶ 152-53 (alleging the City offered written testimony to the Siting Board that the site plan approval process would be completed in sixty days, but then refused to process the plaintiffs' site plan). Similarly, Nicastro allegedly has made false and misleading statements to the state Ethics Commission in order to defeat complaints by the plaintiffs regarding her bias, to avoid having to recuse herself from project submissions, and to prevent any regulatory or enforcement actions that might be triggered by the plaintiffs' complaints.  Id. at ¶ 175.

Moreover, on August 26, 2010, the City adopted apparently contradictory positions in two separate state courts.  Id. at ¶¶ 218-19.  Before the Land Court, the City defended its refusal to process the plaintiffs' site plan until the BCC issued a wetland permit by arguing it was within the plaintiffs' power to eliminate the basis for the refusal by expediting its appeal of the BCC's decision in the Superior Court.  Id. at ¶¶ 219-20.  Meanwhile, before the Superior Court, the City filed a motion seeking to stay the very appeal it had suggested the plaintiffs could expedite.  Id. at ¶ 221.

F.     Other Allegations of Animus

The plaintiffs have identified several other actions taken by some or all of the defendants which, the plaintiffs suggest, demonstrate the defendants' malicious intent to discriminate

14

against them, are probative of the defendants' concerted action and their understanding of the illegality of their conduct, and underscore the extent to which this case differs from a run-of-the-mill land dispute.  Perhaps the most serious example is the assertion that the defendants engaged in the acts at issue here in the face of legal advice warning against such conduct.  Id. at ¶¶ 177-83.  Specifically, the plaintiffs allege that, "on multiple occasions," City officials "ignored the advice of the City's own legal counsel," who warned against "delay tactics" and reminded officials of "their legal obligations to treat the plaintiffs fairly . . . and not discriminate."  Id. at ¶¶ 177, 179; see id. at ¶ 183 (noting a "senior City official with personal knowledge of conversations with" the defendants had described the City's legal counsel's role as akin to "being a monitor at a children's playground," alleging "[t]hey were told but they didn't listen").

The defendants were specifically counseled not to improperly delay technical review of the plaintiffs' site plans, id. at ¶ 177, and were further admonished "in response to complaints about the City's pattern of discrimination and denials of due process," id. at ¶ 179.  Nicastro was individually advised to "recuse herself from further action relative to the Project," and warned that failure to recuse despite a conflict of interest could trigger "personal civil liability for damages."  Id. at ¶ 182.

In addition to acting without heeding the warnings of the City's legal counsel, the plaintiffs allege the following supplemental facts probative of the defendants' motives:

• Upon realizing their efforts to rezone the property ex post facto would not be effective, the City Council unsuccessfully "submitted seven separate Home Rule Petitions . . . to the state legislature" in repeated attempts "to obtain municipal authority to target the Project."  Id. at ¶ 59.

- In 2008 and 2009, defendants Balzotti and Stewart "pressured City employees to invent a pretextual reason to take the plaintiffs' land by eminent domain." Id. at ¶ 185.[8]

- City officials, including DuBois and Mayor Balzotti, have publicly – and falsely – disparaged the project and those associated with it. See, e.g., id. at ¶ 210 (public claims, discredited by state officials, that the project was dangerous and would spread disease); id. at ¶ 213 (accusation that the project's "foreign owners are trying to pollute Brockton"); id. at ¶ 192 (advice to local business owners not to work with the plaintiffs' consultant "because of his affiliation with the disfavored Project").

- Defendant Nicastro founded, financially contributed to, and was attorney of record for "the Alliance Against Power Plant Location . . . , a group specifically formed by her to oppose the Project." Id. at ¶ 165. Furthermore, she has claimed in public filings that the project "'will substantially and particularly affect' her and her family and the value of her property, which is within less than one mile of the proposed industrial facility." Id. at ¶ 168 (emphasis omitted).[9]

- The defendants allegedly coordinated their actions throughout the conspiracy via communication "deliberately taken out of the public eye using personal e-mail and voice-mail accounts and devices in violation of the state Open Meeting laws," in an attempt to

---

[8]At the time, Balzotti was a city councilor. Doc. No. 48 at ¶ 22. Stewart argues he was not a public official in 2008 and 2009, see Doc. No. 63 at 5 n.5, but this fact appears nowhere in the amended complaint, and it would not undermine the relevance of such actions to assessing Stewart's motivations after he assumed office.

[9]The plaintiffs have challenged Nicastro's decision-making authority with respect to the project under state ethics laws. Doc. No. 48 at ¶ 174. Although the initial challenge was unsuccessful, allegedly due to "false and misleading denials" by Nicastro, id. at ¶ 175, it appears as though the plaintiffs' complaint remains pending in some form, Doc. No. 68 at 35 n.7.

shield such communications from later disclosure or discovery.  Id. at ¶ 151.

G.    Federal Suit

The plaintiffs sued the defendants in June 2012, then amended their complaint two months later, asserting the following claims: (i) substantive and procedural due process violations; (ii) equal protection violations; (iii) tortious interference with advantageous business relations; (iv) civil conspiracy; and (v) unlawful denial of the public right to access the municipal water system.  Doc. No. 48 at ¶¶ 248-82 (Counts I through V).  In addition to monetary damages, the plaintiffs also seek declaratory and injunctive relief.  Id. at ¶¶ 283-97 (Counts VI and VII).

The City and the Planning Board have answered the Amended Complaint, but the remaining eight defendants have moved to dismiss it in its entirety.  They challenge it on numerous grounds: (i) absolute legislative or quasi-judicial immunity; (ii) First Amendment immunity; (iii) qualified immunity; and (iv) specific attacks on the sufficiency of allegations against individual defendants with respect to each discrete claim.[10]  Doc. Nos. 54, 58, 60, 62, 64.  Each of these challenges will be addressed in turn below.

II.    12(b)(6) STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

---

[10]The City Council, Brophy, DuBois, and Stewart ("the City Council Defendants") also suggest certain claims are time-barred, insofar as they arise from actions taken more than three years before the plaintiffs brought suit.  Doc. No. 63 at 16; see Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991) (per curiam).  This argument is a nonstarter.  The Amended Complaint reasonably can be construed as alleging a continuing violation of the plaintiffs' constitutional rights, either serial (with discrete acts like the denial of access to municipal water occurring within the limitations period) or systemic (with discriminatory practices related to water access continuing in the limitations period).  See Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994).  In any case, allegations regarding events occurring before June 2009 are relevant to the defendants' alleged motives, malice, and bad faith, and to an assessment of whether their later actions are conscience-shocking.

Procedure, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff[]." Watterson, 987 F.2d at 3. "[F]actual allegations" must be separated from "conclusory statements in order to analyze whether the former, if taken as true, set forth a plausible, not merely a conceivable, case for relief." Juarez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 276 (1st Cir. 2013) (internal quotations omitted). This "highly deferential" standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)) (internal quotation marks omitted).

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A court's assessment of the pleadings is "context-specific," requiring "the reviewing court to draw on its judicial experience and common sense." Id. at 679; accord Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not

18

'show[n]' – 'that the pleader is entitled to relief.'" <u>Iqbal</u>, 556 U.S. at 679 (quoting Fed. R. Civ.

P. 8(a)(2)).  Where, on the other hand, plaintiffs allege facts sufficient to "nudge[] their claims

across the line from conceivable to plausible," dismissal is not warranted.  <u>Twombly</u>, 550 U.S. at

570.

III.    <u>DISCUSSION</u>

        The Amended Complaint, read as a whole and drawing all reasonable inferences in the

plaintiffs' favor, alleges the defendants have attempted to deprive the plaintiffs of their right to

develop their land by engaging in a concerted scheme to essentially illegally rewrite the local

zoning code and bankrupt the plaintiffs.  To accomplish this, the defendants have conspired to

uniformly refuse to consider, or summarily reject, all applications for project-related permits and

approvals, irrespective of the merit of those submissions and, in many instances, the plaintiffs'

legal entitlement to such permits and approvals.  Each individual defendant allegedly has acted

to further the conspiracy, knowing that his or her actions were coordinated with those of the

other defendants to achieve their common objective.  They allegedly have done so

notwithstanding that the plaintiffs wish to use their land for a lawful purpose (a purpose for

which the land has been specifically zoned for nearly fifty years), despite several decisions by

state agencies approving the project after extensive consideration of its environmental and other

impacts, and in the face of warnings from the City's legal counsel.  Moreover, the defendants

allegedly have undermined any victories obtained by the plaintiffs after challenging the

defendants' arbitrary and discriminatory conduct in state court by manipulating testimony and

information put before state agencies and courts, by continuing to improperly refuse or reject

subsequent applications, and by drawing out proceedings such that permits previously granted to

the plaintiffs expire.

According to the plaintiffs, the nature of the alleged conspiracy, the serial litigation that has resulted therefrom, and the overall egregiousness of the defendants' collective actions remove this case from the realm of "run of the mill" land-use disputes that federal courts in this jurisdiction have been reluctant to entertain.  It is against this backdrop, which consists of substantially more than "threadbare recitals of the elements of a cause of action," Iqbal, 556 U.S. at 678, that the Court considers the moving defendants' requests for dismissal.

    A.    Absolute Immunity

        1.    *Legislative and Quasi-Judicial Immunities*

Various moving defendants suggest they are entitled to absolute immunity from suit. First, the City Council Defendants claim they are protected from civil liability based on legislative immunity.  Doc. No. 63 at 12-15.  This assertion, at least at this early stage, is questionable in light of the plaintiffs' allegations regarding the non-legislative nature and discriminatory effect of many of the City Council Defendants' actions.

"Officials acting in a legislative capacity have absolute immunity from suit and liability under § 1983." Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 7 (1st Cir. 2000); accord S. Middlesex Opportunity Council, Inc. v. Town of Framingham, 752 F. Supp. 2d 85, 111 (D. Mass. 2010) (hereinafter "SMOC").  "Legislative immunity applies to local legislators as well as to their state and federal counterparts." Acevedo-Garcia, 204 F.3d at 8 (citing Bogan v. Scott-Harris, 523 U.S. 44 (1998)).  The protection, however, is limited to actions that are "within the sphere of legitimate legislative activity." SMOC, 752 F. Supp. 2d at 111 (internal quotation marks omitted).  "The administrative or executive actions of legislators are not entitled to

protection." <u>Acevedo-Garcia</u>, 204 F.3d at 8.  Actions are administrative if they "single out individuals or groups, rather than create general policies."  <u>SMOC</u>, 752 F. Supp. 2d at 111; <u>see</u> <u>Cutting v. Muzzey</u>, 724 F.2d 259, 261 (1st Cir. 1984) (explaining actions are not legislative if they are based on facts "that relate to particular individuals or situations," or if they affect specifiable individuals differently from others).

Considered in light of these principles, the Amended Complaint alleges the City Council Defendants engaged in several administrative, not legislative, actions as part of the larger conspiracy.  For example, the following alleged acts fall well beyond "the sphere of legitimate legislative activity": "threaten[ing] in a letter to eliminate ('delete') the Water Commission . . . unless the Project's drinking water approval was withdrawn," Doc. No. 48 at ¶ 115; removing Water Commissioners who voted for the approval and replacing them with officials who would deny future renewal requests, <u>id.</u> at ¶¶ 118-19; and refusing to consider or vote on the plaintiffs' proposal to purchase treated effluent from the City, while actively seeking other buyers for the same quantity of water, <u>id.</u> at ¶¶ 135, 144-45.  Although adopting zoning ordinances and amendments and passing resolutions are facially legislative in nature, the plaintiffs here allege those measures were taken based on facts related to them, in particular, and in an effort to affect them differently from other developers.  Moreover, even if legislative immunity would nonetheless shield the City Council Defendants from liability based on such actions, it would not preclude the plaintiffs from relying on those actions as evidence of the ill will and bad faith that allegedly motivated the City Council Defendants with respect to the non-legislative conduct listed above.  As such, dismissal on the basis of legislative immunity is inappropriate.

Defendants Nicastro and McAllister likewise argue they are shielded from suit based on

the related doctrine of quasi-judicial immunity.  Doc. No. 59 at 7-9; Doc. No. 61 at 7-10.  This

argument is flawed for similar reasons.

The doctrine of quasi-judicial immunity "provides absolute immunity for public officials,

including agency officials, who perform quasi-judicial functions."  Coggeshall v. Mass. Bd. of

Registration of Psychologists, 604 F.3d 658, 662 (1st Cir. 2010).  Like legislative immunity,

whether this protection applies depends on the character of the actions at issue.  See Bettencourt

v. Bd. of Registration in Med., 904 F.2d 772, (1st Cir. 1990) (distinguishing actions taken in an

adjudicatory capacity from "administrative" acts and acts beyond the official's jurisdiction or

"sphere of duty"); Cutting, 724 F.2d at 262 (denying quasi-judicial immunity to a planning

board's "routine exercise of administrative discretion"); cf. Dotzel v. Ashbridge, 438 F.3d 320,

324, 327 (3d Cir. 2006) (finding quasi-judicial immunity applied to claims arising from actions

taken by a township board of supervisors in its official capacity through lawful procedures, but

refraining from draping "the mantle of quasi-judicial immunity . . . indiscriminately upon the

shoulders of every municipal board of supervisors or like entity").

Local planning board members could, in certain circumstances, properly invoke this

absolute immunity.  For example, if a planning board were to deny a permit application based on

good-faith consideration of the applicant's submission, after a public hearing, and in a reasoned

decision setting forth the basis for the denial, it would be acting in a quasi-judicial capacity and

likely would be immune from liability for its determination.  See Dotzel, 438 F.3d at 324, 327.

Here, however, the plaintiffs have alleged conduct by both Nicastro and McAllister that is

plainly administrative in nature, including: concocting pretextual reasons to summarily reject a

filing (i.e., the plaintiffs' preliminary subdivision plan) that other local officials previously had

deemed acceptable, Doc. No. 48 at ¶¶ 79, 84-85; withholding from the public and other planning board members information necessary to properly consider the submission, id. at ¶¶ 90-91; and preventing the plaintiffs' representative from speaking during a public hearing on the submission, id. at ¶¶ 96.  See also id. at ¶¶ 121, 162 (alleging Nicastro improperly directed others to summarily deny a building permit and acted to ensure the denial of the plaintiffs' drinking water extension).  Such actions fall outside the bounds of the quasi-judicial immunity doctrine.

2.    <em>First Amendment Immunities</em>

Mayor Balzotti, Harrington, and the City Council Defendants characterize "comments they made regarding (or in opposition to) the power plant" as statements on "a matter of public concern" which are protected by "a conditional privilege to convey . . . opinions . . . without any concomitant liability in tort."  Doc. No. 63 at 15, 23-25; accord Doc. No. 55 at 6; Doc. No. 65 at 3; see also Doc. No. 59 at 20.  This argument misapplies the Noerr-Pennington doctrine and the First Amendment protections enjoyed by public officials.

It is well established that private citizens who lobby or petition public officials are immune from suit for such activities.  SMOC, 752 F. Supp. 2d at 112 (citing United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965), and E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961)).  "The Noerr-Pennington doctrine," however, "does not apply to government activities."  Id.  Although public officials "do not check all of their First Amendment rights at the door upon accepting public employment," Lewis v. Cowen, 165 F.3d 154, 158 (2d Cir. 1999), the First Amendment does not protect officials who "use[] their positions of authority to manipulate the treatment of" certain individuals, to "target [individuals] for discriminatory treatment," or to accomplish "fraudulent or unlawful purposes," SMOC, 752

23

F. Supp. 2d at 113 (internal quotation marks omitted).

The plaintiffs have not alleged claims based on petitioning by the individual defendants in their private capacities.  See Doc. No. 68 at 48 (explaining allegation that appeals made by Stewart, in his individual capacity, to local officials are not the basis for the plaintiff's § 1983 claims).  Nor have the plaintiffs predicated their claims upon mere statements or expressions of opposition to the project.  Id. at 48-49 (distinguishing between voicing opposition, and recklessly and maliciously publishing information known to be false).  Rather, the plaintiffs' claims are grounded in allegations that the defendants used their official positions "to manipulate the treatment of" the plaintiffs and their project-related submissions, to "target" the plaintiffs "for discriminatory treatment" not experienced by other developers in Brockton, and to accomplish "unlawful purposes" such as defeating the project by forcing the plaintiffs to expend substantial resources engaging in serial litigation in order to obtain permits to which they were legally entitled.  See SMOC, 752 F. Supp. 2d at 113; Doc. No. 48 at ¶¶ 122-23, 143-44, 156-57, 226-27, 242-43.  The First Amendment does not protect against claims arising from such activities.

    B.    Due Process

        1.    *Procedural Due Process*

The moving defendants challenge the plaintiffs' due process claim, arguing state law has provided adequate post-deprivation remedies and noting the plaintiffs successfully have availed themselves of those remedies several times.  See, e.g., Doc. No. 55 at 7-10; Doc. No. 59 at 11-14.  The plaintiffs counter this by pointing to their allegations of a "systematic deprivation" of their property rights which, "coupled with [the defendants'] repeated disregard for state mandates to respect" those rights, has "subverted any post-deprivation remedies . . . and rendered

them a nullity."  Doc. No. 68 at 36.

"Procedural due process guarantees that a state proceeding which results in a deprivation of property is fair."  Licari v. Ferruzzi, 22 F.3d 344, 347 (1st Cir. 1994).  To allege a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must allege: "(1) that it had a property interest defined by state law; and (2) that defendants, acting under color of state law, deprived it of that interest without adequate process."  Id. (citing PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 30 (1st Cir. 1991)).  The First Circuit generally approaches procedural due process challenges to local land-use and zoning decisions with considerable skepticism:

> [W]here . . . the state has erected a complex statutory scheme and provided for avenues of appeal to the state courts, property is not denied without due process simply because a local planning board rejects a proposed development for erroneous reasons or makes demands which arguably exceed its authority under the relevant state statutes.

Creative Env'ts, Inc. v. Estabrook, 680 F.2d 822, 832 n.9 (1st Cir. 1982); see also, e.g., San Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465, 490 (1st Cir. 2012) (en banc) (finding developer's procedural due process claim arising from improper emergency halt on project was precluded by the Parratt-Hudson doctrine where prompt post-deprivation process was available); Chongris v. Bd. of Appeals of Town of Andover, 811 F.2d 36, 40 (1st Cir. 1987) (rejecting a procedural due process claim where there was a "suitable" but "arguably imperfect" pre-deprivation hearing, with "meaningful judicial review" available thereafter).

Post-deprivation remedies have been deemed sufficient (and fatal to a procedural due process claim) even where "relief might be delayed, and damages are unavailable."  Licari, 22 F.3d at 348.  The First Circuit, however, has permitted procedural due process claims to proceed through discovery in the land-use context where there were allegations that, after post-

deprivation judicial proceedings had resolved in a plaintiff's favor, the defendants had arbitrarily "disregard[ed] and subvert[ed]" a state court order, "flouted the mandate of the state court," and rendered the ruling for the plaintiff "a nullity."  Roy v. City of Augusta, 712 F.2d 1517, 1523 (1st Cir. 1983).[11]  It also has suggested a procedural due process claim might arise if a plaintiff were denied permits by "a supposedly neutral body" based on "the opposition of certain politicians and local residents, rather than . . . on the regulations under which [the neutral body] operates."  Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 47 n.7 (1st Cir. 1992).

Although proving a procedural due process violation in the land-use context is no simple task, the plaintiffs have alleged sufficient facts to avoid dismissal at this point in the proceedings. First, this is not a case where the plaintiffs complain about one or two discrete permit denials or other obstructive acts that were subsequently remedied by state courts.  See, e.g., San Geronimo Caribe Project, 687 F.3d at 490; Licari, 22 F.3d at 347-48.  Instead, the plaintiffs allege repeated summary denial – or refusal to even consider – a series of applications and submissions necessary throughout the course of the project, requiring repeated resort to the state courts to obtain relief.  See Doc. No. 48 at ¶¶ 85, 122, 135, 153, 162, 229, 234.  The systemic nature of the defendants' refusal to provide any meaningful pre-deprivation process sets this case apart from those previously considered by courts in this jurisdiction, and suggests the defendants were not misinterpreting or misapplying the law, but were collectively determined not to follow it.

---

[11]Nicastro wrongly suggests that Roy is no longer good law, as it pre-dates the Supreme Court's decisions in Parratt and Hudson.  See Doc. No. 74 at 4.  Those subsequent decisions, which focus on whether pre-deprivation process is constitutionally required, did not impact the part of Roy that focuses on the effects of efforts to subvert state-court **post-deprivation** process.

Second, the actions about which the plaintiffs complain allegedly were undertaken by the defendants as representatives of "supposedly neutral bod[ies]" based on their personal or political views (or their perception of local residents' views), and not as a result of good-faith interpretations of applicable regulations.  See Nestor Colon Medina, 964 F.2d at 47 n.7.

Third, the plaintiffs further allege that, in an effort to manipulate the available post-deprivation process (i.e., state administrative and court proceedings), the defendants pressed "legally untenable" theories, offered false testimony and assurances, coached other witnesses regarding the substance of their testimony, and precluded witnesses who supported the project from appearing.  Doc. No. 48 at ¶¶ 152, 161, 163, 175, 227, 231.  Despite these efforts, the plaintiffs succeeded in obtaining relief in each discrete instance, at least once as a result of the City's concession that the plaintiffs' claims were meritorious.  See id. at ¶¶ 98-100.  However, at some point during the course of the serial litigation described by the plaintiffs, the defendants' collective refusal to cease their obstructive behavior in light of the state courts' consistent rulings against them became tantamount to a decision to flout or subvert the courts' orders and to undermine any relief granted to the plaintiffs.[12]  See Roy, 712 F.2d at 1523.

Such a widespread, concerted effort to ignore the law and defeat the project by consistently denying the plaintiffs proper consideration of their submissions (absent a court order), and then to undermine the fairness of state post-deprivation proceedings – especially in a

---

[12]Additionally, as the plaintiffs noted during oral argument, the nature of the types of building permits and plan approvals at issue here is such that they often expire after a finite period of time.  See, e.g., Doc. No. 48 at ¶ 114.  As such, the defendants' conspiracy to deny meaningful review until ordered otherwise by a court could effectively nullify a "win" for the plaintiffs in any given state-court action, if delay incurred as a result of the sometimes lengthy litigation over subsequent denials were to persist beyond the expiration date associated with any previously secured relief.

project requiring numerous permits and approvals – goes beyond the typical circumstances in which the First Circuit previously has rejected procedural due process claims in this context. Accordingly, the defendants' motions are denied with respect to Count I, insofar as it alleges a procedural due process violation.

2.   <em>Substantive Due Process</em>

Next, the moving defendants argue the plaintiffs have not alleged the type of "conscience-shocking" conduct required to support a substantive due process claim.  <u>See, e.g.</u>, Doc. No. 59 at 15-16; Doc. No. 61 at 13-15; Doc. No. 63 at 17-20.  The plaintiffs seek to distinguish this action from "a 'run of the mill' dispute between a developer and city officials," arguing they have alleged conduct sufficiently outrageous to state a substantive due process claim.  Doc. No. 68 at 29-36.

"[S]ubstantive due process ensures that [a state proceeding which results in a deprivation of property] is not arbitrary and capricious."  <u>Licari</u>, 22 F.3d at 347.  It prevents the "abuse of government power that shocks the conscience, or action that is . . . not sufficiently keyed to any legitimate state interest."  <u>PFZ Props.</u>, 928 F.2d at 31-32; <u>accord</u> <u>Clark v. Boscher</u>, 514 F.3d 107, 112 (1st Cir. 2008).  Although the First Circuit routinely has rejected substantive due process claims in the zoning and land-use contexts, it has "left the door slightly ajar for federal relief in truly horrendous situations."  <u>Nestor Colon Medina</u>, 964 F.2d at 45; <u>accord</u> <u>Licari</u>, 22 F.3d at 350; <u>Collier v. Town of Harvard</u>, No. 95-cv-11652, 1997 WL 33781338, at *5 (D. Mass. Mar. 28, 1997); <u>see</u> <u>Chongris</u>, 811 F.2d at 43 (noting "even abridgments of state law [in the land-use context] committed in bad faith do not necessarily amount to constitutional deprivation of due process," but acknowledging that there could exist a "type of egregious official behavior which

28

could conceivably work a breach of the due process clause"); cf. Gianfrancesco v. Town of Wrentham, 712 F.3d 634 (1st Cir. 2013) (finding "vague" complaints of "a pattern of selective and excessive enforcement of municipal regulations" were not conscience-shocking).

To state such a claim in this Circuit in the land-use context, a plaintiff must allege "fundamental procedural irregularity, racial animus, or the like," or violation of "a fundamental principle."  Clark, 514 F.3d at 113 (internal quotations omitted); cf. Nestor Colon Medina, 964 F.2d at 45-47 (noting a plaintiff must demonstrate a "high" level of "abuse of government power," and distinguishing between actions demonstrating "personal hostility toward the applicants" and obstacles that "any other developer would have faced").  For example, another session of this Court permitted a substantive due process claim to not only survive through discovery but also proceed to trial where plaintiffs had adduced evidence of governmental coercion and extortion to further the personal interests of a local official.  Collier, 1997 WL 33781338, at *5-7.

The plaintiffs have done enough, at this stage in the proceedings, to distinguish their allegations from the sort of "run of the mill" land-use claims often brought by disappointed developers and rejected by federal courts in this jurisdiction.  The defendants have cited no decisions – and the Court has located none – in which a court within the First Circuit has confronted a conspiracy involving a pattern of conduct of the magnitude alleged here.  The alleged ongoing refusal of the defendants to even consider the plaintiffs' submissions – in other words, the systemic denial of any pre-deprivation process at all despite repeated reversals by the state courts – constitutes the sort of "fundamental procedural irregularity" that has been absent in many previous cases; it is the very definition of "arbitrary and capricious" conduct.

In particular, the summary denial of the plaintiffs' application for an extension of the previously granted drinking water approval, and the actions allegedly taken by various moving defendants to secure that denial, rise to the level of a "truly horrendous situation" which implicates the substantive due process doctrine.  The denial of this fundamental right, guaranteed to all property owners under state law, essentially renders the plaintiffs unable to develop their land for any purpose, and not just the lawful use contemplated here.  The conscience-shocking nature of the alleged conspiracy as a whole is underscored by allegations that the defendants often acted against the advice of legal counsel, to further their own personal and political interests, and while knowing there was no legal justification for their actions.  This adequately alleges government action that the substantive due process clause forbids.  See Nestor Colon Medina, 964 F.2d at 47 n.7.

Under these circumstances, the plaintiffs have pleaded facts sufficient to warrant discovery on their substantive due process claim.

   C.      Equal Protection

Count II of the Amended Complaint alleges a class-of-one equal protection claim.  See Doc. No. 68 at 19.  The moving defendants assert three primary challenges to Count II, arguing: (1) the Barry Brothers' original project is not "similarly situated" to the current project; (2) the plaintiffs have not sufficiently alleged that the individual defendants acted in bad faith or with malice; and (3) the individual defendants here were not the decision-makers who issued approvals for the Barry Brothers' project.  See, e.g., Doc. No. 76 at 6-10; Doc. No. 77 at 6-8; Doc. No. 78 at 7-9.  None of these challenges justifies dismissal.

"A claim for a 'class of one' equal protection violation is cognizable when – and only

when – a plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir. 2008) (internal quotation marks omitted); accord Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam); Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007); see Freeman v. Town of Hudson, No. 12-1356, 2013 WL 1502183, at *5 (1st Cir. Apr. 15, 2013) (requiring proof that the selective treatment "was based on impermissible considerations such as . . . malicious or bad faith intent to injure a person"). Although the Court of Appeals has noted "an obvious danger to opening up local permitting decisions to detailed federal judicial scrutiny under equal protection rubric," Nestor Colon Medina, 964 F.2d at 44, the danger is limited by two additional requirements that are imposed by First Circuit precedent in this area.  First, the Court has considered whether a complaint stands apart from typical land-use cases by incorporating "adequate[] alleg[ations] that defendants' actions were motivated by malicious or bad faith intent to injure." SBT Holdings, 547 F.3d at 35 (internal quotation marks omitted).[13]

Second, "[t]he 'similarly situated' requirement [is] enforced with particular rigor in the land-use context" to prevent disappointed developers from elevating "every zoning decision" to a federal constitutional claim. Cordi-Allen, 494 F.3d at 251.  "Two persons or entities are similarly situated if a prudent person, looking objectively at the incidents [complained of], would think them roughly equivalent and the protagonists similarly situated . . . in all relevant respects." Clark, 514 F.3d at 114 (alterations in original, internal quotation marks omitted); see

---

[13]Although the Supreme Court has not decided whether this is a firm prerequisite, see Olech, 528 U.S. at 565, the First Circuit has noted its existence at least bolsters an equal protection claim in this context.

Freeman, 2013 WL 1502183, at *5 (requiring "an extremely high degree of similarity," which means more than identifying abutting parcels subject to the same use restrictions).

According to the facts alleged in the Amended Complaint, the Barry Brothers' original project is similarly situated – indeed, it was "virtually identical" – to the plaintiffs' project "in all material respects."  Doc. No. 48 at ¶ 204.  The only distinction between the projects apparent from the plaintiffs' allegations is a temporal one.  The materiality of that distinction, and the existence of any other differences suggested by the defendants in their moving papers, cannot be discerned from the record before the Court at this time.  Thus, although discovery could reveal that the two projects are, in fact, less than "identical," the plaintiffs have adequately alleged the "high degree of similarity" required to state a class-of-one equal protection claim at this stage. See Cordi-Allen, 494 F.3d at 251.

In addition, the plaintiffs have sufficiently pled "that defendants' actions were motivated by malicious or bad faith intent to injure."  SBT Holdings, 547 F.3d at 35 (internal quotation marks omitted).  For example, they allege the individual defendants were motivated by concerns such as preserving their own property values, protecting "their political and financial investment in opposition to the Project," promoting their careers, keeping a developer viewed as a foreign energy "powerhouse" out of Brockton, and exhausting the plaintiffs' resources and impairing their ability to secure financing.  Doc. No. 48 at ¶¶ 10, 242; see id. at ¶¶ 59, 94, 126, 151, 159, 164, 170, 186, 200 (alleging various actions taken by the defendants that are probative of their ill will, such as searching for a large-scale water purchaser to foreclose the plaintiffs from gaining cooling water).

Although the defendants suggest they may not be held liable for an equal protection

32

violation where they were not the decision-makers who granted permits and approvals related to the Barry Brothers' project, they have cited no cases to support this view.  Assuming the defendants are correct that the earlier decisions were made by other officials,[14] the fact that their predecessors in office may have rendered the relevant decisions with respect to the Barry Brothers' project, without more, is not sufficient to warrant dismissal of the plaintiffs' equal protection claim now.  Different officials might reasonably reach different conclusions when considering the same or similar applications, but they may not constitutionally do so without any rational basis.[15]  Here, the plaintiffs have alleged there was no rational basis for the difference in treatment, and they have done so with more than mere conclusory allegations.  As such, their equal protection claim survives the defendants' motions.

      D.      <u>The Individual Defendants</u>

Throughout their moving papers, the individual defendants each urge the Court to ignore the actions allegedly taken by their co-conspirators and focus only on their own discrete conduct.  <u>See, e.g.</u>, Doc. No. 61 at 3-4; Doc. No. 63 at 5, 10-11.  They do so based on the principles that a plaintiff must allege "minimal facts as to who did what to whom, when, where, and why," <u>Educadores Puertorriqueños en Acción v. Hernández</u>, 367 F.3d 61, 68 (1st Cir. 2004), and that

---

[14]It is not apparent from the Amended Complaint whether any or all of the individual defendants played a role in any of the earlier decisions.  Although the allegations make clear that Balzotti was not elected mayor until late 2009, Doc. No. 48 at ¶ 22, they do not specify when she was elected to City Council (the position she held before becoming mayor), or when any of the other defendants assumed official positions within the local government.  The Amended Complaint does, however, suggest that at least Balzotti supported the Barry Brothers' project.  <u>Id.</u> at ¶ 209.

[15]Notably, the disputed decisions here did not, on the facts alleged by the plaintiffs, turn on good-faith disagreement about the law or permissible exercises of discretion.

an individual faces liability under § 1983 only for his or her conduct that was "causally connected to" a deprivation of federally protected rights.  See Gutierrez -Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir. 1989).

Here, the plaintiffs have alleged that each individual defendant knowingly joined the conspiracy and acted in furtherance of its goal – "to 'reject, deny and starve' the Project" as detailed in the Amended Complaint.  See Doc. No. 48 at ¶¶ 45-46.  The individual defendants' actions cannot be assessed fairly, particularly at this early point in the case, without considering as a backdrop this alleged agreement.  Moreover, federal pleading standards do not forbid a plaintiff from including some general allegations against multiple defendants, nor do they require courts to ignore allegations against definable subgroups of defendants, such as "the City Councilors" or "the City Council, including defendants Brophy, DuBois and Stewart," e.g., id. at ¶ 58, so long as the plaintiffs also have provided enough specificity to "give the defendant[s] fair notice of what the . . . claim[s are] and the grounds upon which [they] rest[]," see Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  The plaintiffs have done so here.

As to each individual defendant, the plaintiffs have made the following specific allegations:

• Mayor Balzotti instigated the "scheme to destroy the Project," id. at ¶ 45; "reinforced" the "no action" resolution by "publicly and privately pronounc[ing] the official City policy against the Project . . . and instructing City officials and employees to carry out this policy," id. at ¶ 71; directed another City official with respect to his testimony at a Siting Board proceeding, id. at ¶¶ 72-73, 161; replaced members of the Water

34

Commission with individuals who "would participate in the scheme against" the plaintiffs, id. at ¶ 119; attempted to sell the City's excess potable water "in order to close out the power plant," id. at ¶ 145; and refused to permit "pro-Project" City employees to testify before the Siting Board, id. at ¶ 163.

• Nicastro orchestrated a "pretextual scheme" to reject the plaintiffs' preliminary subdivision plan by "fabricating reasons" and "pretending that it had not been properly filed," id. at ¶¶ 84-85; instructed another official not to provide other Planning Board members with the plaintiffs' submissions, id. at ¶ 90; prevented the plaintiffs' representative from speaking at a Planning Board meeting, id. at ¶ 96; instructed another official not to issue a certificate of constructive approval to which the plaintiffs were entitled, id. at ¶ 103; notified Mayor Balzotti when the plaintiffs sought renewal of their drinking water approval, id. at ¶ 121; instructed another official "on how to anticipatorily deny building permit applications" that the plaintiffs had not yet submitted, id. at ¶ 162; retained decision-making authority with respect to the project despite her active personal and financial participation in a group opposed to the project, id. at ¶¶ 164-69; and misled the state Ethics Board when the plaintiffs complained about her bias, id. at ¶ 175.

• Brophy voted to pass the February 2010 "no action" resolution specifically targeting the plaintiffs, id. at ¶¶ 61-63; threatened to eliminate the Water Commission after it approved the plaintiffs' request for access to municipal drinking water, id. at ¶ 115, then removed the members of the Commission who had voted for the approval, id. at ¶ 118; made efforts to sell the amount of cooling water the plaintiffs requested to a different large-scale buyer "in order to close out the power plant," id. at ¶¶ 144-45; and informed the

Siting Board that the City could not spare the amount of water the plaintiffs sought, despite his own efforts to identify another purchaser for it, id. at ¶ 202.

- DuBois also voted to pass the February 2010 "no action" resolution specifically targeting the plaintiffs, id. at ¶¶ 61-63; threatened to eliminate the Water Commission after it approved the plaintiffs' request for access to municipal drinking water, id. at ¶ 115, then removed members of the Commission who had voted for the approval and replaced them with individuals who would deny any subsequent renewal request, id. at ¶¶ 118-19; made efforts to sell the amount of cooling water the plaintiffs requested to a different large-scale buyer "in order to close out the power plant," id. at ¶¶ 144-45; prevented "pro-Project" officials from appearing before the Siting Board, id. at ¶ 163; and maligned Brockton Power as a company with "foreign owners" intent on "polluting American citizens for their own selfish, greedy gains," id. at ¶ 213.

- Stewart likewise voted to pass the February 2010 "no action" resolution specifically targeting the plaintiffs, id. at ¶¶ 61-63; made efforts to sell the amount of cooling water the plaintiffs requested to a different large-scale buyer "in order to close out the power plant," id. at ¶¶ 144-45; and "pressured City employees to invent a pretextual reason to take the plaintiffs' land by eminent domain," id. at ¶ 185.

- McAllister ratified Nicastro's efforts to reject the plaintiffs' preliminary subdivision plan for pretextual reasons by directing that the submission "be kept off the publicly posted Planning Board agenda," id. at ¶ 91, and preventing the plaintiffs' representative from speaking at a Planning Board meeting, id. at ¶ 96.

- Harrington instigated the "scheme to destroy the Project," id. at ¶ 45; and "summarily

36

instructed" other City officials "not to process" the plaintiffs' site plan during a

previously scheduled technical review, despite warnings from legal counsel, id. at

¶¶ 154-56, 177-78.

The specific actions the plaintiffs have identified and attributed to each individual

defendant, considered alongside the defendants' alleged agreement and participation in the

conspiracy, are the sort of "minimal facts as to who did what to whom, when, where, and why"

that are sufficient to state § 1983 claims against each defendant.  See Hernández, 367 F.3d at 68.

The further allegation that each of the specified acts was undertaken as part of an overarching

conspiracy to discriminate against the plaintiffs is sufficient to establish that the individual

defendants' conduct was at least "causally connected to" the deprivations about which the

plaintiffs complain.  See Gutierrez-Rodriguez, 882 F.2d at 559.

E.      Qualified Immunity

All moving defendants invoke the doctrine of qualified immunity.  Doc. No. 55 at 5-6;

Doc. No. 59 at 10-11; Doc. No. 61 at 10-11; Doc. No. 63 at 22-23; Doc. No. 65 at 3.  Although

this may pose a closer question at summary judgment, the plaintiffs have alleged sufficient facts

to avoid dismissal on qualified immunity grounds at this time.

"Qualified immunity permits government officials to perform discretionary functions

without facing personal liability or the burdens of litigation," unless: (1) "the defendant's actions

violated a federal or constitutional right," and (2) "the right was 'clearly established' at the time

of the alleged violation."  SMOC, 752 F. Supp. 2d at 110; accord Maldonado v. Fontanes, 568

F.3d 263, 269 (1st Cir. 2009).  The second prong of this test requires a determination of whether

"a reasonable defendant would have understood that his conduct violated the plaintiffs'

constitutional rights." <u>Maldonado</u>, 568 F.3d at 269.  The qualified immunity doctrine shields

officials from liability for "'reasonable, although mistaken, conclusion[s]' about the lawfulness

of [their] conduct." <u>SMOC</u>, 752 F. Supp. 2d at 110 (quoting <u>Cookish v. Powell</u>, 945 F.2d 441,

443 (1st Cir. 1991) (per curiam)).  The doctrine protects "all but the plainly incompetent or those

who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986); <u>accord</u> <u>Walden v.</u>

<u>City of Providence</u>, 596 F.3d 38, 52 (1st Cir. 2010).  Qualified immunity is an affirmative

defense, and the burden of proving the doctrine's applicability is on the defendants seeking to

invoke it. <u>DiMarco-Zappa v. Cabanillas</u>, 238 F.3d 25, 35 (1st Cir. 2001).

    As set forth above, the plaintiffs have presented sufficient allegations of constitutional

violations, satisfying the first prong of the qualified immunity analysis.  <u>See</u> §§ III(B)-(C), <u>supra</u>.

With respect to the second prong, the plaintiffs repeatedly have alleged that the defendants

"knowingly violate[d] the law." <u>Malley</u>, 475 U.S. at 341; <u>see, e.g.</u>, Doc. No. 48 at ¶¶ 106, 150.

Two factual allegations are especially relevant to assessing whether reasonable people in the

defendants' positions would have realized their conduct violated the plaintiffs' due process and

equal protection rights.  First, the defendants allegedly acted in the face of warnings from the

City's legal counsel against "delay tactics," "acting outside the rules," and failing "to treat the

plaintiffs fairly, disclose conflicts of interest, and not discriminate."[16] <u>Id.</u> at ¶¶ 177, 179.

---

[16]Certain defendants claim such warnings were not sufficient to put a reasonable person
on notice of the illegality of their actions for purposes of the qualified immunity analysis because
they referenced "state law rather than Plaintiffs' civil rights." <u>E.g.</u>, Doc. No. 81 at 2 (emphasis
omitted).  The relevant allegations, however, say nothing about "state law," and the Court is
satisfied that a reasonable person would understand that a lawyer's advice on concepts such as
"treating people fairly" and "not discriminating" implicates civil rights, especially when drawing
all reasonable inferences in the plaintiffs' favor.
    Some defendants also complain that the plaintiffs have not specified that each individual
defendant personally received such warnings from counsel. <u>See</u> Doc. No. 80 at 5.  In light of the

Second, the plaintiffs allege the defendants formed an agreement pursuant to which all applications and submissions related to the project would be either "rejected . . . out of hand" or denied after "pretextual reviews."  Id. at ¶¶ 46-48.  Reasonable people in the defendants' positions should have understood such a systemic denial of any process whatsoever – including the denial of a landowner's request for access to drinking water – was beyond the scope of constitutionally permissible conduct.

The defendants' bids for qualified immunity, therefore, are denied without prejudice to renewal at summary judgment, after further development of the relevant facts in discovery.

F.    State Torts

The moving defendants also seek dismissal of the plaintiffs' state-law claims.  With respect to tortious interference with advantageous relations (Count III), they argue the plaintiffs have not identified a "business relationship" with which the defendants interfered, and have not adequately alleged an improper purpose on the part of the defendants.  See, e.g., Doc. No. 55 at 12-13; Doc. No. 59 at 19-21; Doc. No. 63 at 25-27.  At this early stage, the plaintiffs have alleged sufficient facts to state a tortious interference claim against each of the individual defendants.

Under Massachusetts law, a tortious interference claim requires proof of the following four elements: "(1) the plaintiff was involved in a business relationship *or anticipated involvement in one*, (2) the defendant knew about the relationship, (3) the defendant

---

alleged collective action undertaken by the co-conspirators here, and considering the relatively small nature of the local government at issue and the scope of the alleged communication among the defendants, the plaintiffs' allegations that certain defendants were admonished by counsel allow the Court to reasonably infer at this stage of the proceedings that all of the defendants were on constructive notice of the warnings.

intentionally interfered with the relationship for an improper purpose or by an improper means[,] and (4) the plaintiff suffered damages as a result." Int'l Floor Crafts, Inc. v. Adams, 477 F. Supp. 2d 336, 339 (D. Mass. 2007) (emphasis added).

The Amended Complaint adequately addresses each of these elements.  First, the plaintiffs allege that, based on agreements obtained previously by the Barry Brothers, they anticipated entering into contracts with the City to purchase effluent for cooling at the plant, to provide electricity to the City's residents, and to obtain a "payment in lieu of taxes" agreement from the City.  Doc. No. 48 at ¶ 42.  Next, the plaintiffs allege the defendants were aware of these anticipated relationships, id. at ¶ 44, and that they improperly interfered through their concerted efforts to destroy the project out of malice directed at the plaintiffs and their project, e.g., id. at ¶¶ 9-10.[17]  Finally, they allege harm, including monetary damages resulting from lost profits and extensive litigation costs.  Id. at ¶¶ 227, 242, 268.  Accordingly, the defendants' motions fail as to Count III.

With respect to Count IV, the moving defendants argue the plaintiffs have no viable conspiracy claim because they have not alleged each defendant knew of the others' conduct and assisted or encouraged it.  See, e.g., Doc. No. 59 at 21-22.  The plaintiffs contend they have sufficiently alleged a "concerted action" conspiracy under Massachusetts law.  Doc. No. 68 at 50-52.

Massachusetts recognizes a vicarious liability form of civil conspiracy, pursuant to which

---

[17]Claims by the defendants that their motivations were not "improper" rely on assertions that are beyond the scope of the Amended Complaint and, thus, cannot be considered here.  See, e.g., Doc. No. 55 at 13 (arguing Balzotti's "legitimate purpose" was to "protect[] and advanc[e] the interests of the citizens of Brockton").

a plaintiff must allege "an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement." Blake v. Prof'l Coin Grading Serv., No. 11-cv-11531, 2012 WL 4903334, at *19 (D. Mass. Oct. 16, 2012).  Such a conspiracy can be pursued "under a 'concert of action' theory or a 'substantial assistance' theory." Id.  The plaintiffs have opted for the latter, which requires allegations that the defendants "agreed to work toward an unlawful result and [took] steps to do it." Id. at *20.  "[I]t is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved." Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, (1st Cir. 1994); see Kyte v. Philip Morris Inc., 556 N.E.2d 1025, 1035 (Mass. 1990) (explaining agreement may be "implied" or "inferred due to the concerted action of the parties").

As discussed above, the plaintiffs have adequately pleaded the various tortious acts underlying their conspiracy claim, so the defendants cannot prevail in their challenges to Count IV to the extent they depend on the challenges levied against the underlying civil rights violations and torts.  Moreover, the plaintiffs have explicitly alleged an agreement among the defendants to commit such acts. Id. at ¶¶ 45-46.  They also have alleged substantial concerted action undertaken by various combinations of the defendants over an extended period of time, including discrete acts in furtherance of the conspiracy committed by each individual defendant. See § III(D), supra.  Such allegations are more than sufficient to state a civil conspiracy claim.

In Count V, which is limited to the City and the City Council Defendants, the plaintiffs assert a claim entitled "unlawful denial of public right to access municipal water system."  Doc. No. 48 at ¶¶ 277-82.  The City Council Defendants interpret this as an attempt to create a

"federally secured, statutory or common law right" which does not exist.  Doc. No. 63 at 28-29.

In response, the plaintiffs point to various state-court decisions recognizing that landowners in

Massachusetts have "a right to a supply of water, which it [is] the duty of the city as the operator

of a public utility to furnish on the same terms" to everyone.  See Doc. No. 68 at 52-54 (quoting

B. & B. Amusement Enters. v. City of Bos., 8 N.E.2d 788, 789 (Mass. 1937)).

The City Council Defendants' attacks on this claim are unpersuasive.[18]  First, nothing in

the Amended Complaint suggests the plaintiffs seek to enforce (or create) a federal right.

Second, Count V does not appear to be limited to the denial of access to effluent for cooling,

particularly in light of the earlier allegations that the plaintiffs have been denied access to

drinking water based on the City Council Defendants' actions.  See Doc. No. 48 at ¶ 279 (citing

the plaintiffs' "request for access to the municipal water system, *including* to purchase treated

effluent" (emphasis added)); id. at ¶¶ 115-119, 122.  Whether this claim provides a basis for

relief independent of the plaintiffs' other causes of action, and whether the Court could (or

should) require the City to sell two million gallons of treated effluent to the plaintiffs, are issues

that are more properly resolved at summary judgment, after the completion of discovery and

with the benefit of more complete briefing by the parties.  At a minimum, Count V articulates a

state-law claim for access to drinking water that requires further factual development to resolve.

---

[18]The Court also notes the City Council Defendants offered no response in their reply
brief to the arguments the plaintiffs made opposing dismissal of Count V.

G.     <u>Injunctive Relief</u>[19]

Defendants Balzotti, Nicastro, and McAllister seek dismissal of the plaintiffs' claim for injunctive relief, summarily arguing the plaintiffs are not likely to succeed on the merits of their claims and have not demonstrated a "real and immediate threat" of future violations of their rights.  <u>See</u> Doc. No. 55 at 13-14; Doc. No. 59 at 22-23; Doc. No. 61 at 19-20.

The standards governing issuance of a permanent injunction are familiar: (1) the plaintiff has suffered, or will suffer, an irreparable injury; (2) remedies available at law are inadequate to compensate for the injury; (3) the balance of hardships between the parties favors the entry of an injunction; and (4) the public interest would not be harmed.  <u>See Global NAPs, Inc. v. Verizon N.E., Inc.</u>, 706 F.3d 8, 13 (1st Cir. 2013).[20]

In light of the allegations discussed throughout this Memorandum, the plaintiffs have adequately pled each of these factors.  <u>See also</u> Doc. No. 48 at ¶ 293 (alleging additional "permits, licences, and other authorizations from the defendants" are necessary in order to complete the project).

---

[19]None of the moving defendants assert meaningful challenges to the plaintiffs' request for declaratory judgment (aside from their assertions of various immunities).  The only defendants to reference the claim (Count VI) are: McAllister, who merely observes it is not directed at him, <u>see</u> Doc. No. 61 at 19; and the City Council Defendants, who note that the same relief could be obtained via mandamus proceedings in state court, <u>see</u> Doc. No. 63 at 12 n.13.

[20]The defendants' reliance on the element of "likelihood of success on the merits" confuses the plaintiffs' injunction claim with a motion for a preliminary injunction.  For the injunction claim here to survive the motions to dismiss, there is no burden on the plaintiffs to plead anything more than facts sufficient to state the underlying claims set forth in the first five counts of their amended complaint.  As set forth in the foregoing sections of this Memorandum, they have done so.

IV.     <u>CONCLUSION</u>

Whether there is merit to the plaintiffs' claims remains to be seen, as the discovery

process will develop the underlying facts and reveal to what extent they support the averments

before the Court now.  However, the detailed allegations in the plaintiffs' substantial Amended

Complaint are sufficient to state the claims set forth therein.  Accordingly, the defendants'

motions to dismiss are DENIED.

Pursuant to Rule 12(a)(4)(A), the moving defendants' answers to the Amended

Complaint are due on June 13, 2103.  The Court will hold a Rule 16 scheduling conference in

this action on July 11, 2013 at 3:00 pm.  The parties shall file their joint statement under Local

Rule 16.1(D) no later than July 3, 2013.

SO ORDERED.


  /s/ Leo T. Sorokin
Leo T. Sorokin
Chief U.S. Magistrate Judge