UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BROCKTON POWER LLC, and ) <br> BROCKTON POWER COMPANY LLC, ) <br>     Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> CITY OF BROCKTON, PLANNING BOARD ) <br> OF THE CITY OF BROCKTON, BROCKTON ) <br> CITY COUNCIL, LINDA M. BALZOTTI, ) <br> THOMAS BROPHY, MICHELLE DUBOIS, ) <br> JASS STEWART, JAMES HARRINGTON, ) <br> WAYNE MCALLISTER & SUSAN NICASTRO, ) <br>     Defendants. ) <br> ) | C.A. NO. 1:12-cv-11047-JLT |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BROCKTON
CITY COUNCIL'S PARTIAL MOTION FOR JUDGMENT
ON THE PLEADINGS AS TO COUNT VI**

**INTRODUCTION**

This action arises out of the efforts of the plaintiff, Brockton Power Company LLC (not to be confused with Brockton Power LLC), to construct and operate a 350-megawatt electric power generating plant (the "Project") within the City of Brockton.[1] The Project's natural gas-fired turbines will require approximately 2 million gallons of cooling water per day in order to operate. First Amended Complaint, ¶ 128. In July 2007, Brockton Power Company LLC (the

---

[1] Brockton Power LLC is a limited liability company duly organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Holbrook, MA. The majority members of Brockton Power LLC are two brothers, Dennis and Leo Barry. First Amended Complaint, ¶ 17. Brockton Power Company LLC is a startup entity organized in November 2006 and funded by Siemens Corporation and other energy investors. Id., ¶ 36. Sometime after its formation, Brockton Power Company LLC (the startup) purchased an option to buy certain industrial land in Brockton – the so-called "Generator Site" – from the Barry Brothers, who had already abandoned their own plans to build a power generating plant within the City. Id., ¶¶ 35 & 37. "The Barry Brothers also assigned to Brockton Power [Company LLC] their rights and assets under all contracts and prospective contracts relating to the development of an electric generation facility on the Generator Site." Id., ¶ 38.

"plaintiff" or "BPC") submitted a proposal to the state Energy Facilities Siting Board to use treated effluent water (*i.e.,* water discharged from the City's wastewater treatment plant) for its cooling purposes. Id., ¶ 132. On August 7, 2009, the Energy Facilities Siting Board approved BPC's proposal. Brockton Power Co. LLC v. Energy Facilities Siting Bd., 469 Mass. 215, 216 (2014).

On November 13, 2007, the Brockton City Council ("City Council") adopted an amendment to Chapter 23, "Water, Sewers and Sewage Disposal," of the Revised Ordinances of the City of Brockton ("Effluent Amendment"), which provides:

> Section 23-45. SALE OR USE OF INFLUENT OR EFFLUENT FROM THE WASTE WATER TREATMENT FACILITY
>
> Any sale, use or agreement to provide or transfer the influent and/or the effluent discharge from the Waste Water Treatment Facility owned by the City of Brockton shall require approval of the City Council by a two-third (2/3) vote of the entire council. If any provision or clause of this section or application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the section which can be given effect without the invalid provision or applications, and to this end the provisions of this section are declared to be severable.

First Am. Complaint, ¶ 133. On the following day, November 14, 2007, then-Mayor James Harrington signed the Effluent Amendment, making it effective.

To date, BPC has not obtained the requisite City Council approval to purchase effluent water from the City's wastewater treatment plant. Instead, on June 12, 2012, BPC filed this suit for injunctive relief and damages, claiming (among other things) that the Effluent Amendment is "invalid" and, therefore, (presumably) unenforceable. Id., ¶ 134. According to BPC, by imposing the requirement of "a supermajority (*i.e.*, two-thirds) vote by all city councilors, the Effluent Amendment is invalid as it violates the simple majority and quorum rules of M.G.L. c. 43, § 18, the state law setting forth the powers and duties of city councils." Id. Thus, in Count

VI of its First Amended Complaint ("Declaratory Relief"), BPC seeks a declaration that "[a]n actual controversy exists between plaintiffs and defendants with respect to whether certain votes taken by the City Council to pass ordinances and resolutions implicitly directed at the Project are valid." First Am. Complaint, ¶ 284.  Indeed, as part of its relief, BPC asks this Court to "[o]rder the defendants [*i.e.,* the City Council] to approve the proposed purchase of treated effluent by [BPC] . . .." Id., Prayer for Relief, ¶ 3.

Through recent settlement negotiations with the Mayor of Brockton, BPC now takes an entirely different turn.  To be precise, BPC no longer seeks to invalidate the Effluent Amendment but, rather, attempts to bypass it by resurrecting a 15-year old public bid contract for the sale of surplus effluent water that was never properly executed, and was based on a bid award that has long since expired.  In short, by re-writing history, BPC now takes the position that City Council approval for the sale of effluent was never needed in the first place!

On February 26, 2015, BPC and the City of Brockton, through current Mayor Bill Carpenter, entered into a Settlement Agreement (the "Settlement Agreement"),[2] as well as an Agreement for the Sale of AWRF Effluent (the "AWRF Agreement")[3]  They did so despite the fact that the duly-adopted and signed Effluent Agreement has never been revoked or rescinded, nor been declared invalid or otherwise unlawful by any judicial authority.  As a condition of the Settlement Agreement, the Mayor agreed to execute "a contract for the sale of treated effluent from the City's advanced waste water reclamation facility (the 'AWRF') . . .."[4]  Under the AWRF Agreement signed that same day, "[t]he City agree[d] to sell [BPC] treated effluent from the AWRF Facility in the amount of two million (2,000,000) GPD for the Term of this

---

[2] A copy of the Settlement Agreement is attached hereto as Exhibit 1.
[3] A copy of the AWRF Agreement is attached hereto as Exhibit 2.
[4] Exhibit 1, Condition 1(c), at 4.

Agreement."[5] In consideration, BPC agreed to pay the City $100,000 per year.[6] Thus, BPC and the Mayor reached an agreement regarding the "sale," "use," provision or "transfer" of effluent from the wastewater treatment plant within the meaning of the Effluent Amendment, but without a vote of the City Council.

The Effluent Agreement is a valid and enforceable ordinance that BPC and the Mayor cannot simply ignore for the mere expedience of settling this suit. Such disregard of a valid City ordinance is not only outside the authority of BPC and the Mayor, but also creates a disturbing precedent whereby the City's executive branch can choose to ignore the legislative acts of its own City Council. Toward that end, the City Council now moves for partial judgment on the pleadings as to Count VI of plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(c), and specifically asks this Court to enter an order declaring that (1) the Effluent Amendment is valid and enforceable; and (2) the City Council's approval is required in order for BPC and the City to enter into the AWRF Agreement.

## FACTUAL BACKGROUND

In October 1999, the Brockton Department of Public Works ("DPW") published an "Invitation to Bid on Surplus Property" ("Invitation to Bid") pursuant to M.G.L. c. 30B, § 10.[7] Specifically, the City offered two separate blocks of effluent water to public bidders, each in the amount of up to two million gallons per day. (Ex. 3, at 2). Notably, the Invitation to Bid was subject to certain bid specifications, including:

---

[5] Exhibit 2, Section 1(a), at 4.
[6] Id., Section 3, at 5.
[7] A copy of the Invitation to Bid is attached hereto as Exhibit 3. In reviewing a motion under Rule 12(c), as in reviewing a motion under Rule 12(b)(6), a court may consider "documents the authenticity of which are not disputed by the parties; [or] official public records . . .." Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007), quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The Exhibits attached hereto fall into one or both of these categories.

- <u>Amount</u>: No bidder "may bid or have awarded to said bidder more than one individual block of plant effluent up to the amount note[d] herein . . ." (*i.e.*, two million gallons per day);

- <u>Commencement</u>: "In no event shall the commencement of the contract for the purchase of effluent be later that (sic) 24 months after the date of the bid award";[8]

- <u>Term</u>: The contract for the sale of effluent "shall be for a period of (30) years," subject to up to three additional five-year extensions on the same terms; and

- <u>Assignment</u>: "The contract, or any part of it, may not be transferred or assigned to another company or individual without the written consent of the City of Brockton."

Most importantly, any contract for the sale of effluent awarded to a successful bidder remained subject to the authorization and approval of the City Council and the Mayor "as required by local ordinance or any other statute." To be clear, Paragraph 12 of the Information for Bidders expressly stated: "Contracts will be subject to the approval of the Brockton City Council."

On November 23, 1999, Brockton Power LLC, the limited liability company owned by the Barry Brothers, submitted a "Bid Form" to purchase one block of effluent water (2,000,000 GPD) for $100,000.[9] As explained in their Bid Form, the Barry Brothers intended to use the water to operate a 270-megawatt electric power generating plant to be built at the Generator Site in Brockton. (Ex. 4, Petition Approved by Zoning Board of Appeals). They also confirmed a "firm date of delivery" as "Twenty Four (24) Months After Date of Said Bid Award." (<u>Id.</u>, Appendix "C"). The Brockton DPW subsequently accepted the Barry Brothers' bid and, on January 24, 2000, based on the terms of the Invitation to Bid and the applicant's Bid Form, the City Council voted to award a contract for the sale of surplus effluent for a term not to exceed forty (40) years.[10]

---

[8] Exhibit 3, Information for Bidders, ¶ 10.
[9] A copy of the Barry Brothers' Bid Form is attached hereto as Exhibit 4.
[10] A copy of the City Council's January 24, 2000 vote is attached hereto as Exhibit 5.

Yet, despite the Barry Brothers' successful bid and the January 2000 vote of the City Council, no contract for the sale of surplus effluent ever materialized.  In fact, the Barry Brothers eventually called off their plans to build a power plant within the City of Brockton.  As explained in the First Amended Complaint: "Efforts to complete the Barry Brothers' proposed project were abandoned following the Enron bankruptcy and subsequent economic downturn, which made the project's economics and financing less feasible."  First Am. Complaint, ¶ 35.

Nearly seven years later, apparently when the economy had begun to improve, Siemens Corporation[11] and other energy investors decided to take up the scheme previously abandoned by the Barry Brothers by forming a startup "to develop, construct, and operate an electric generation facility on the Generator Site."  First Am. Complaint, ¶ 36.  The energy investors named their startup "Brockton Power Company LLC."  And, although this startup subsequently purchased an option to buy the Generator Site and all rights the Barry Brothers held in any contracts relating to their abandoned project, Id., ¶ 38, it goes without saying that any such rights were no greater in the hands of BPC than they were in the hands of the Barry Brothers.  Thus, if the Barry Brothers could no longer enforce the long forsaken effluent contract, nor could BPC.

**ARGUMENT**

**I.      Standard of Review**

A motion for judgment on the pleadings under Rule 12(c) is ordinarily accorded the same treatment as a motion to dismiss under Rule 12(b)(6).  Aponte-Torres v. Univ. of Puerto Rico, 445 F.3d 50, 54 (1st Cir. 2006).  The court accepts all well-pleaded material facts as true and considers the same in a light most favorable to the non-moving party.  Gray v. Evercore

---

[11] "Siemens is a global powerhouse focusing on the areas of electrification, automation and digitalization.  One of the world's largest producers of energy-efficient, resource-saving technologies, Siemens is a leading supplier of systems for power generation and transmission . . . ." http://www.siemens.com/about/en/

Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008).  And, although the court will also draw all reasonable inferences in favor of the non-moving party, Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2007); a pleading's conclusions will not be deemed admitted.  Ashcroft v. Iqbal, 556 U.S. 662, 678-680 (2009).  Judgment is appropriate if the pleadings, so viewed, fail to support a "plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007), quoting Bell Atl. Corp. v. Twombly, 500 U.S. 544, 559 (2007).

## II.     The 2015 Settlement Agreement and AWRF Agreement are Invalid.

Initially acknowledging that City Council approval of the sale of effluent water was still required, BPC wrote to the City Council on December 30, 2009, requesting that "the Brockton City Council authorize the sale of 2.0 million gallons per day ('GPD') of surplus effluent … and authorize the City's Mayor and Chief Financial Officer to negotiate and enter into a final agreement."[12]  Further acknowledging that no agreement for the sale of effluent yet existed, BPC actually went so far as to file a Project Change with the Energy Facilities Siting Board in April 2010 seeking to use City drinking water (instead of effluent) for the Project's cooling needs.  In July 2014, the Massachusetts Supreme Judicial Court affirmed the Siting Board's denial of BPC's Project Change, see Brockton Power Company LLC v. Energy Facilities Siting Bd., 469 Mass. 215, 225-26 (2014), thereby confirming that BPC must use effluent for its cooling needs.

Now, more than 15 years after the Barry Brothers were successful bidders on one block of 2,000,000 gallons of effluent water, BPC has taken the remarkable step of attempting to re-animate an inchoate agreement to effect a settlement with the Mayor.  This maneuver necessarily begs the question: If the 2000 "contract" with Barry Brothers was indeed legally enforceable, why did BPC behave for so long as if was not?  The answer, of course, is that the 2000

---

[12] See correspondence from "brocktoncleanenergy" to City Council dated December 30, 2009, a copy of which is attached hereto as Exhibit 6.

"contract" with Barry Brothers was *not* (and *is not*) legally enforceable. The fiction of enforceability should not allow BPC to construct and operate its power plant without a City Council vote on the sale of effluent.

Not only does the 2015 AWRF Agreement attempt to resurrect a 15-year old "contract" that never materialized, it also fails to comply with the bid specifications as set forth in the original Invitation to Bid and Bid Form approved by the City Council in January 2000. In several key respects, the 2015 Agreement does not match up with the alleged 2000 "contract."

**Amount**: The 2015 AWRF Agreement provides for the sale of up to 2,300,000 gallons of effluent per day to BPC,[13] whereas the 1999 Invitation to Bid and the Barry Brothers' Bid Form tentatively agreed on a sale of 2,000,000 GPD.[14]

**Commencement**: The 2015 AWRF Agreement provides that it shall not become effective until several conditions are satisfied, including, but not limited to, BPC's receipt of "all approvals, permits, licenses and governmental authorities necessary for it to construct and operate the Project,"[15] a condition unlikely to be met any time sooner than 2016 (at the earliest). The 1999 Invitation to Bid, on the other hand, provided that "[i]n no event" shall the contract for the purchase of effluent commence any "later that (sic) 24 months after the date of the bid award."[16] Indeed, in their Bid Form, the Barry Brothers expressly committed to a firm commencement date of 24 months after the bid award – *i.e.*, by no later than late 2001 or early 2002.[17]

---

[13] Exhibit 2, Section 1(a) & (b), at 3.
[14] The Invitation to Bid expressly provided that "no bidder" may bid for or have awarded "more than one individual block of plant effluent" – *i.e.*, 2,000,000 GPD. Exhibit 3, at 2.
[15] Exhibit 2, Section 11, at 8.
[16] Exhibit 3, at 2.
[17] Exhibit 4, Appendix "C," Section C.

**Term**: The 2015 AWRF Agreement states it shall run for a term of thirty (30) years, subject to BPC's right to extend for two additional terms of five (5) years each.[18] Again, however, such Agreement shall not become effective until several conditions are satisfied, including, but not limited to, BPC's receipt of "all approvals, permits, licenses and governmental authorities necessary for it to construct and operate the Project."[19] Assuming this condition is met in 2016 (at the earliest), this means the City is contractually obligated to sell effluent to BPC through 2046, and perhaps through 2056 if BPC exercises its two five-year options. Compare this with the terms of the 1999 Invitation to Bid and Barry Brothers' Bid Form which would have bound the City to a 30-year contract to sell effluent through 2030, subject to three five-year extensions expiring in 2045. In short, the "new" contract ties the City's hands for far longer than the original.

**Assignment**: The Invitation to Bid provides that "[c]ontracts will be subject to the approval of the Brockton City Council."[20] Thus, on January 24, 2000, the City Council voted to award a contract to the successful bidders, the Barry Brothers of Holbrook. The Invitation to Bid further provides that any contract for the sale of effluent "may not be transferred or assigned to another company or individual without the written consent of the City of Brockton."[21] It is undisputed that the City Council did not consent in writing to the transfer or assignment of the Barry Brothers' contract to BPC, the startup formed by Siemens and other energy investors in 2006.

---

[18] Exhibit 2, Section 4(a), at 5
[19] Id., Section 11, at 8.
[20] Id., Information for Bidders, ¶ 12.
[21] Exhibit 3, Information for Bidders, ¶ 3. The Information for Bidders also provides that "[c]ontracts will be subject to the approval of the Brockton City Council.

9

**Facility Size**: Finally, the 1999 Bid Form concerned the construction and operation of a 270-megawatt electric power generating plant to be built at the Generator Site. In contrast, the 2015 Settlement Agreement contemplates the construction and operation of a 350-megawatt plant, a facility 30% larger than the one to which the City Council voted to sell effluent 15 years ago.

"[G]eneral principles of fairness obligate solicitors of competitive bids to consider only those bids that conform to the specifications issued." Cataldo Ambulance Service, Inc. v. City of Chelsea, 43 Mass. App. Ct. 26, 30 (1997). The purpose of competitive bidding statutes is "to establish an open and honest procedure for competition for public contracts." Modern Constr. Co., Inc. v. City of Lowell, 391 Mass. 829, 840 (1984). "Strict adherence to bidding procedures is required even where no harm to the public can be shown …." Int'l Salt Co., LLC v. City of Boston, 547 F. Supp. 2d 62, 70 (D. Mass. 2008), aff'd, 590 F.3d 1 (1st Cir. 2009). "While minor variations do not compel rejection of a bid, . . . variations as to matters of substance are material, . . . and this is so even in cases where the violation benefits the public." Id., at 31 (citations omitted).[22] See M.G.L. c. 30B, § 2 (defining "minor informalities" in bids as "minor deviations, insignificant mistakes, and matters of form rather than substance . . ..") M.G.L. c. 30B, § 5, clearly prevents such material changes where "[a]fter bid opening, a bidder may not change the price or any other provision of the bid in a manner prejudicial to the interests of the governmental body or fair competition. The procurement officer shall waive minor informalities or allow the bidder to correct them." As described above, BPC has significantly deviated from several provisions of the Barry Brothers' original 1999 bid, none of which are "minor

---

[22] The Office of the Inspector General cautions solicitors of public bids under Chapter 30B: "You must evaluate bids using only the criteria identified in the IFB [Invitation for Bid.]" The Chapter 30B Manual: Procuring Supplies, Services and Real Property, Commonwealth of Massachusetts Office of the Inspector General (August 2014), at 42.

deviations" that can or have been waived by the City's procurement officer.  Strict adherence to statutory bidding requirements is required in matters of substance. Grande & Son, Inc. v. School Hous. Comm. of N. Reading, 334 Mass. 252, 258 (1956).

BPC can neither ignore nor materially deviate from the terms of the 1999 Invitation for Bid or the Bid Form of the successful bidders, the Barry Brothers.  Yet, as set forth above, the 2015 AWRF Agreement does precisely that. These deviations are anything but minor informalities. *See e.g.*, Gil-Bern Const. Corp. v. City of Brockton, 353 Mass. 503, 504 (1968) (failure to include construction progress schedule with bid proposal deemed minor deviation); Fred C. McClean Heating Supplies, Inc. v. Sch. Bldg. Comm'n of Springfield, 341 Mass. 322, 324 (1960) (clerical error leaving blank line item did not invalidate bid).  And, since the 2015 Settlement Agreement is dependent upon an enforceable AWRF Agreement, both Agreements must be held invalid.  "The general rule in this Commonwealth is that failure to adhere to statutory bidding requirements makes void a contract entered into without such compliance." Phipps Products Corp. v. Massachusetts Bay Transp. Auth., 387 Mass. 687, 691 (1982).  If BPC wishes to purchase effluent from the City, it must seek approval from the City Council in accordance with the 2007 Effluent Amendment.  It cannot avoid such approval by resurrecting a prior pre-Amendment "contract" that never materialized.

### III.     The Effluent Amendment is a Valid and Lawful City Ordinance.

As set forth above, the Effluent Amendment provides, in part, that "[a]ny sale, use or agreement to provide or transfer the influent and/or the effluent discharge from the Waste Water Treatment Facility owned by the City of Brockton shall require approval of the City Council by a two-third (2/3) vote of the entire council."  In its First Amended Complaint, BPC challenges the Effluent Amendment on the grounds that it violates the simple majority and quorum rules of

M.G.L. c. 43, § 18. First Am. Complaint, ¶ 134. But because the two-third vote is neither expressly forbidden by state law nor inconsistent with Brockton's City Charter, BPC cannot circumvent the Effluent Amendment to purchase the City's waster waste discharge.

Municipal by-laws are presumed to be valid. Marshfield Family Skateland, Inc. v. Town of Marshfield, 389 Mass. 436, 440 (1983). When exercising a right to govern locally, a municipality exceeds its power only when it passes legislation inconsistent with the Constitution or laws of the Commonwealth. Amherst v. Attorney Gen., 398 Mass. 793, 796 (1986), *citing* art. 89 of the Amendments to the Massachusetts Constitution, § 6 (Home Rule Amendment); M.G.L. c. 43B, § 13 (Home Rule Procedures Act). In determining whether a local ordinance or by-law is inconsistent with a State statute, the "question is not whether the Legislature intended to grant authority to municipalities to act ..., but rather whether the Legislature intended to deny [a municipality] the right to legislate on the subject [in question]." Wendell v. Attorney Gen., 394 Mass. 518, 524 (1985). The courts have given municipalities "considerable latitude" in adopting local legislation, requiring a "sharp conflict" between the ordinance or by-law and the statute before invalidating the local law. Bloom v. Worcester, 363 Mass. 136, 154 (1973). Such a conflict "appears when either the legislative intent to preclude local action is clear, or, absent plain expression of such intent, the purpose of the statute cannot be achieved in the face of the local by-law." Grace v. Brookline, 379 Mass. 43, 54 1038 (1979). The mere existence of a comprehensive statutory scheme will not invalidate a local ordinance that concerns the same subject matter. Easthampton Savings Bank v. City of Springfield, 874 F.Supp.2d 25, 30 (D. Mass. 2012) (local ordinance regulating maintenance of foreclosure properties was not preempted by and did not conflict with state statutory scheme governing foreclosures); Take Five Vending, Ltd. v. Town of Provincetown, 415 Mass. 741, 743 & 746 (1993) (town by-law

prohibiting sale of cigarettes in vending machines held valid as it did not conflict with statutes requiring State administration of cigarette excise taxes).  A conflict, however, has been found to exist where a town adopted an ordinance setting forth the membership and 3-year terms of planning board members that was facially inconsistent with the 5-year terms for such membership as set forth in the controlling state statute, M.G.L. c. 41, § 81A.  Del Duca v. Town Administrator of Methuen, 368 Mass. 1, 13 (1975); see also New England Tel. & Tel. Co. v. City of Lowell, 369 Mass. 831, 834–835 (1976) (ordinance requiring employment of registered engineers and land surveyors for projects held invalid as applied to telephone company, since it conflicted with state's comprehensive regulatory scheme of public utilities). The Effluent Amendment, and the requirement that the City Council approve any contract concerning the sale or use of effluent water, however, is not in "sharp conflict" with any comprehensive statutory scheme.

> **A.  An Ordinance Requiring City Council Approval of the Sale of Effluent Water is not Precluded by State Law.**

Legislative intent to preclude local action can be express or inferred. St. George Greek Orthodox Cathedral of W. Mass., Inc. v. Fire Dep't of Springfield, 462 Mass. 120, 126 (2012); Wendell, 394 Mass. at 524 (noting that determining inconsistency between local enactment and State law where intent is express is relatively easy).  BPC cannot point to any statute that precludes the City Council from requiring its approval of an agreement for the sale of effluent water.  The Court should not overlook the fact that, in enacting by-laws, M.G.L. c. 40, § 21, grants towns wide discretion to "make such ordinances and by-laws, not repugnant to law, as they may judge most conducive to their welfare, which shall be binding upon all inhabitants thereof and all persons within their limits."  In fact, subsection 11 of Section 21, explicitly permits a town to pass local legislation "regulating the disposal by town boards, officers or

13

departments of personal property belonging to the town." Accordingly, in the case of towns, the Legislature has expressed its clear intent to allow a municipality to enact local ordinances and by-laws regulating the sale of personal property, such as surplus effluent water. It can be inferred that the powers of the City Council in this regard are no different than those of a town's Board of Selectmen.

### B. The Effluent Amendment Cannot be Invalidated Because it Contains a Two-Thirds Majority Vote Requirement.

According to BPC, by imposing the requirement of "a supermajority (*i.e.*, two-thirds) vote by all city councilors, the Effluent Amendment is invalid as it violates the simple majority and quorum rules of M.G.L. c. 43, § 18, the state law setting forth the powers and duties of city councils." First Am. Complaint, ¶ 134. The Home Rule Amendment (Article 89, amending Article 2 of the Amendments to the Massachusetts Constitution) ("HRA") defines the basic relationship between municipalities and the Commonwealth. Section 6 of the HRA provides that "[any] city or town may by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it which is not inconsistent with the constitution or laws enacted by the general court … and which is not denied, either expressly or by clear implication, to the city or town by its charter." The Home Rule Procedures Act, M.G.L. c. 43B, § 13, contains virtually identical language. Thus, under the home rule provisions, the city may undertake any action that is not "inconsistent" with State laws or the Constitution. Massachusetts has the "strongest type of home rule." Bloom, 363 Mass. at 143 n. 4. BPC cannot point to any statutory scheme or restriction preventing the City Council from enacting an ordinance requiring a two-thirds majority vote for approval of any contract for the sale of surplus effluent from a wastewater treatment facility.

Under M.G.L. c. 43, § 18, "the legislative powers of the city council may be exercised as provided by ordinance or rule adopted by it." While "a majority of the council shall constitute a quorum, and the affirmative vote of a majority of all the members of the council shall be necessary to adopt any motion, resolution or ordinance," M.G.L. c. 43, § 18 (1), "[t]he city council shall, from time to time, establish rules for its proceedings." M.G.L. c. 43, § 18 (2). Section 2-98 of the City's Ordinances allows the City Council to suspend, amend or repeal its rules and orders. M.G.L. c. 43, § 18, does not restrict a vote of the City Council to only a simple majority. Instead, it only states that a majority "shall be necessary" to adopt an ordinance. Where the City Council is afforded deference in establishing its owns rules of proceedings, the City Council's enactment of an ordinance requiring a two-thirds vote is permissible under both M.G.L. c. 43, § 18 and the City Charter.

Even if the Court were to declare that by imposing a two-thirds vote by all city councilors, the Effluent Amendment is inconsistent with a comprehensive statutory scheme, the Effluent Amendment nonetheless contains the following severability provision:

> If any provision or clause of this section or application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of the section which can be given effect without the invalid provision or application, and to this end the provisions of this section are declared to be severable.

Accordingly, the Effluent Amendment is still valid even if the two-thirds requirement is not. In its place, a simple majority vote applies, requiring that "[a]ny sale, use or agreement to provide or transfer the influent and/or effluent discharge from the Waste Water Treatment Facility owned by the City of Brockton shall require approval of the City Council . . .." Under Massachusetts law, "[t]he provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts

thereof." M.G.L. c. 4 § 6, clause Eleventh. "When a court is compelled to pass upon the constitutionality of a statute and is obliged to declare part of it unconstitutional, the court, as far as possible, will hold the remainder to be constitutional and valid, if the parts are capable of separation and are not so entwined that the Legislature could not have intended that the part otherwise valid should take effect without the invalid part." Murphy v. Comm'r of Dep't of Indus. Accidents, 418 Mass. 165, 169 (1994), *quoting* Massachusetts Wholesalers of Malt Beverages, Inc. v. Com., 414 Mass. 411, 420 (1993), *quoting* Boston Gas Co. v. Dep't of Pub. Utils., 387 Mass. 531, 540 (1982).  "Whenever various portions of a statute have independent force, thus justifying the inference that the enacting body would have passed one without the other, this court will uphold the remainder of the enactment after the offending portion has been stricken." Del Duca, 368 Mass. at 13 (upholding certain provisions of municipal ordinance); *see also* Com. v. Weston W., 455 Mass. 24, 41 (2009) (upholding severability clause in ordinance stating "[i]f any provision, including, inter alia, any exception, part, phrase or term or the application to any person or circumstances is held to be invalid, other provisions or the application to other persons or circumstances shall not be affected thereby.")  Here, construction of the Effluent Amendment should be upheld, if necessary, with a simple majority requirement. Murphy, 418 Mass. at 169.

## CONCLUSION

For the reasons set forth above, the defendant, Brockton City Council, hereby respectfully requests that this Court allow defendant's Partial Motion for Judgment on the Pleadings as to Count VI of plaintiffs' First Amended Complaint and, thereafter, enter an order declaring that:

1. The City Council's 2007 Effluent Amendment is valid; and

2. Brockton Power Company LLC and the City of Brockton, through its Mayor, cannot execute an AWRF Agreement without first obtaining the required approval of the City Council in accordance with the Effluent Amendment.

        The Defendant,
        BROCKTON CITY COUNCIL,

        By its Attorneys,
        **PIERCE, DAVIS & PERRITANO, LLP**

        /s/ John J. Davis
        _____

        John J. Davis, BBO #115890
        Adam Simms, BBO #632617
        Seth B. Barnett, BBO #661497
        90 Canal Street
        Boston, MA 02114
        (617) 350-0950
        jdavis@piercedavis.com

Dated: June 22, 2015

## **CERTIFICATE OF SERVICE**

I, John J. Davis, hereby certify that the foregoing, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that a paper copy shall be served upon those indicated as non-registered participants on June 22, 2015.

        /s/ John J. Davis
        John J. Davis, Esq